NO. COA14-186

NORTH CAROLINA COURT OF APPEALS

Filed: 1 July 2014

IN THE MATTER OF:

                                    Mecklenburg County

    B.S.O.                         Nos. 09 JT 714-17, 10 JT 217
    V.S.O.
    R.S.O.
    A.S.O.
    Y.S.O.

Appeal by respondents from order entered 12 November 2013 by Judge Regan A. Miller in Mecklenburg County District Court. Heard in the Court of Appeals 11 June 2014.

> *Twyla Hollingsworth-Richardson for petitioner-appellee Mecklenburg County Department of Social Services, Division of Youth and Family Services.*

> *Smith Moore Leatherwood LLP, by Carrie A. Hanger, for guardian ad litem.*

> *Appellate Defender Staples Hughes by Assistant Appellate Defender Joyce L. Terres, for respondent-appellant mother.*

> *Rebekah W. Davis for respondent-appellant father.*

STROUD, Judge.

Respondent-parents appeal from an order terminating their parental rights to the minor children B.S.O. ("Brandy," born April 2009), V.S.O. ("Vincent," born May 2006), R.S.O. ("Ronald," born May 2005), A.S.O. ("Adam," born January 2004),

and Y.S.O. ("Yvonne," born April 2010).[1] Because respondent-father is not the father of Adam or Yvonne, his appeal does not involve these children. We note that the district court also terminated the parental rights of Yvonne's father, Jose S., and Adam's putative father, Orlando V., neither of whom are parties to this appeal.

## I. Procedural History

Mecklenburg County Youth and Family Services ("YFS") obtained non-secure custody of Brandy, Vincent, Ronald and Adam on 14 October 2009, and of Yvonne on 9 April 2010. The district court adjudicated the four elder children neglected and dependent juveniles on 10 December 2009, and entered adjudications of neglect and dependency as to Yvonne on 5 May 2010. As we noted in respondents' previous appeal, YFS "first became involved with the family in February of 2006 based on reports of inappropriate discipline and domestic violence. YFS remained involved with the family over the course of the next several years." *In re B.S.O.*, ___ N.C. App. ___, ___, 740 S.E.2d 483, 484 (2013).

YFS filed petitions to terminate respondents' parental

---

[1] We will refer to the juveniles by pseudonym to protect their privacy.

rights on 9 May 2011. The district court held its initial hearing on the petitions between 5 January and 16 March 2012 and entered an order terminating respondents' parental rights on 18 April 2012. On appeal, we reversed the order and remanded to the district court for consideration of respondent-mother's motion to re-open the evidence, which she filed prior to entry of the termination order. *In re B.S.O.*, ___ N.C. App. at ___, 740 S.E.2d at 486-87. The court allowed respondent-mother's motion and received additional evidence in the cause on 18 July and 30 September 2013. By order entered 12 November 2013, the court again concluded that grounds existed to terminate respondents' parental rights and determined that termination was in the best interests of the minor children. Respondents filed timely notices of appeal.

## II.  Standard of Review

Respondents challenge the district court's adjudication of grounds to terminate their parental rights under N.C. Gen. Stat. § 7B-1111(a) (2013). In reviewing the trial court's decision, we must determine whether the findings of fact are supported by clear, cogent and convincing evidence, and whether the findings support the court's conclusions of law. *In re Gleisner*, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000). "If there is

competent evidence, the findings of the trial court are binding on appeal." *In re McCabe*, 157 N.C. App. 673, 679, 580 S.E.2d 69, 73 (2003). An appellant is bound by any unchallenged findings of fact. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991). Moreover, "erroneous findings unnecessary to the determination do not constitute reversible error" where the adjudication is supported by sufficient additional findings grounded in competent evidence. *In re T.M.*, 180 N.C. App. 539, 547, 638 S.E.2d 236, 240 (2006). We review conclusions of law *de novo*. *In re J.S.L.*, 177 N.C. App. 151, 154, 628 S.E.2d 387, 389 (2006).

Respondents challenge each of the grounds for termination found by the district court. However, it is well established that any "single ground . . . is sufficient to support an order terminating parental rights." *In re J.M.W.*, 179 N.C. App. 788, 789, 635 S.E.2d 916, 917 (2006). Therefore, if we determine that the court properly found one ground for termination under N.C. Gen. Stat. § 7B-1111(a), we need not review the remaining grounds. *See In re Humphrey*, 156 N.C. App. 533, 540, 577 S.E.2d 421, 426-27 (2003).

### III. Respondent-father's Appeal

Respondent-father argues the district court erred in

terminating his parental rights based on an adjudication of willful abandonment under N.C. Gen. Stat. § 7B-1111(a)(7) (2013). Respondent-father contends that he was not afforded notice of his need to defend this ground at the termination hearing because the petitions filed by YFS did not specifically allege willful abandonment under subpart (a)(7). *See In re C.W.*, 182 N.C. App. 214, 228-29, 641 S.E.2d 725, 735 (2007). We disagree.

The Juvenile Code requires a motion or petition for termination of parental rights to allege "[f]acts that are sufficient to warrant a determination that one or more of the grounds for terminating parental rights [in N.C. Gen. Stat. § 7B-1111(a)] exist." N.C. Gen. Stat. § 7B-1104(6) (2013). While the allegations "need not be exhaustive or extensive[,]" this Court has held that "they must be sufficient to put a party on notice as to what acts, omission or conditions are at issue." *In re T.J.F.*, ___ N.C. App. ___, ___, 750 S.E.2d 568, 569 (2013) (citation and quotation marks omitted). Moreover,

> [w]hen the petition alleges the existence of a particular statutory ground and the court finds the existence of a ground not cited in the petition, termination of parental rights on that ground may not stand unless the petition alleges facts to place the parent on notice that parental rights could be

terminated on that ground.

*Id.*

Under N.C. Gen. Stat. § 7B-1111(a)(7), parental rights may be terminated if "[t]he parent has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition or motion[.]" N.C. Gen. Stat. § 7B-1111(a)(7). "It has been held that if a parent withholds his presence, his love, his care, the opportunity to display filial affection, and wil[l]fully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child." *Pratt v. Bishop*, 257 N.C. 486, 501, 126 S.E.2d 597, 608 (1962).

The petitions filed by YFS on 9 May 2011 alleged that respondent-father, *inter alia*, "*abandoned said juvenile[s]* in that . . . [he] was deported to Mexico . . . after being incarcerated on September 3, 2010. [His] current whereabouts are unknown." (emphasis added). The petitions further alleged that respondent-father, "for a continuous period of more than (6) months next preceding the filing of the petition[s], ha[d] willfully failed for such period to pay a reasonable portion of

the cost of care for said juvenile[s.]"[2]  Although YFS referred to respondent-father's abandonment of the children in the context of alleging that he "neglected said juvenile[s] as defined in G.S. Section 7B-101(15)[,]" the petitions explicitly asserted that respondent-father had, in fact, "abandoned" his children.  Coupled with allegations that his whereabouts were unknown since his incarceration and deportation in September 2010 – approximately eight months before the petitions were filed – we believe the allegation of abandonment was sufficient to put respondent-father on notice of a potential adjudication under N.C. Gen. Stat. § 7B-1111(a)(7).  *Cf. In re T.J.F.*, ___ N.C. App. at ___, 750 S.E.2d at 569 ("While the better practice would have been to specifically plead termination pursuant to section 7B-1111(a)(7), we conclude the petition here sufficiently alleged facts to place respondent-father on notice that his parental rights may be terminated on the basis that he abandoned his child.").

Respondent-father also argues that the evidence and the district court's findings of fact are insufficient to establish that he willfully abandoned the minor children in the six months immediately preceding YFS's filing of the petition, as required

---

[2] *See* N.C. Gen. Stat. § 7B-1111(a)(3) (2013).

by N.C. Gen. Stat. § 7B-1111(a)(7). He contends that "neither the findings nor the evidence address[es his] intent or the six month time period prior to the filing of the termination petition."

To establish grounds for termination under N.C. Gen. Stat. § 7B-1111(a)(7), YFS was required to show that respondent-father had willfully abandoned his children during the "determinative period" from 9 November 2010 to 9 May 2011, the date it filed its petitions. *In re S.R.G.*, 195 N.C. App. 79, 84-85, 671 S.E.2d 47, 51-52 (2009). "Abandonment implies conduct on the part of the parent which manifests a willful determination to [forgo] all parental duties and relinquish all parental claims to the child." *In re Searle*, 82 N.C. App. 273, 275, 346 S.E.2d 511, 514 (1986). "[T]he findings must clearly show that the parent's actions are wholly inconsistent with a desire to maintain custody of the child." *In re S.R.G.*, 195 N.C. App. at 87, 671 S.E.2d at 53.

Rearranged for clarity, the district court's findings reflect the following facts regarding respondent-father's conduct during the six months that preceded the filing of the termination petitions in May 2011:

> 59. [Respondent-father] was incarcerated

for no operator license offense on 3 September 2010 and deported [to Mexico].

60. He returned to Charlotte at some point in March 2012. . . .

. . . .

47. While in Mexico, [respondent-father] was in contact with the social worker on at least one occasion. During the time [respondent-father] was in Mexico, he did not seek to have his three children . . . come live with him in Mexico. He did not offer any other relative placements for the juveniles.

48. While in Mexico, [respondent-father] did not provide any child support for his children. [He] did not provide or offer any financial assistance for the care of his three children. [He] has not provided any or offered any child support for his children since his return to the United States.

. . . .

52. . . . [Respondent-father] has made no efforts to keep updated on the children while they have remained in custody.

. . . .

30. Neither the respondent-mother nor the respondent[-]father[ has] provided any financial support for the children although they have the ability to do so. [They] have no known disabilities.

Based on these findings, the court concluded that respondent-father "willfully abandoned the juveniles for at least six (6)

consecutive months immediately preceding the filing of the petition[.]" *See* N.C. Gen. Stat. § 7B-1111(a)(7). Although the willfulness of a parent's conduct "is a question of fact to be determined from the evidence[,]" *In re Searle*, 82 N.C. App. at 276, 346 S.E.2d at 514, it is immaterial that the court labeled its finding of willfulness by respondent-father a conclusion of law. *See State v. Hopper*, 205 N.C. App. 175, 179, 695 S.E.2d 801, 805 (2010) (reviewing a mislabeled "conclusion of law" as a finding of fact).

We conclude that these findings support the trial court's conclusion that respondent-father willfully abandoned his children under N.C. Gen. Stat. § 7B-1111(a)(7). They show that, during the relevant six-month period, respondent-father "made no effort" to remain in contact with his children or their caretakers and neither provided nor offered anything toward their support. Although respondent-father was jailed and deported to Mexico in September 2010, this Court has repeatedly held that "a respondent's incarceration, standing alone, neither precludes nor requires a finding of willfulness" under N.C. Gen. Stat. § 7B-1111(a)(7). *In re McLemore*, 139 N.C. App. 426, 431, 533 S.E.2d 508, 510-11 (2000). Similarly, a parent's deportation should serve as "neither a sword nor a shield in a

termination of parental rights decision." *In re P.L.P.*, 173 N.C. App. 1, 10, 618 S.E.2d 241, 247 (2005) (citation and quotation marks omitted), *aff'd per curiam*, 360 N.C. 360, 625 S.E.2d 779 (2006).

Although incarceration and deportation are not exactly the same, we find the cases dealing with incarcerated parents to be instructive. In both situations, a parent has been removed from his home by law enforcement action, presumably against his will. The cases recognize that a parent's opportunities to care for or associate with a child while incarcerated are different than those of a parent who is not incarcerated. The opportunities of an incarcerated parent are even more limited than those of a deported parent, in that once the deported parent has been removed from this country, he would be free to work, send funds to support a child, or communicate with a child by phone, internet, or mail from his own country. His opportunities to see the child personally would be limited, but he would be free to pursue legal action to attempt to have the child returned to his custody in his own country. In any event, respondent-father here failed to take advantage of most of these opportunities after deportation to Mexico.

The evidence showed that respondent-father had the ability

to remain in contact with his children while in Mexico but failed to do so. YFS social worker Lynda Peperak testified that she provided respondent-father with her telephone number in February 2010. Respondent-father was arrested on 3 September 2010 and left Mecklenburg County Jail on 14 September 2010. Ms. Peperak spoke with respondent-father by telephone on 6 and 26 May 2011, having "obtained his phone number from one of the foster parents[,]"[3] and confirmed that he still had Ms. Peperak's phone number. Nevertheless, respondent-father did not contact YFS to inquire about his children following his deportation. Ms. Peperak further testified that respondent-father had never "provided any cards, gifts, letters, or anything" for his three children; nor had he ever paid any support for them before or after YFS filed the petitions to terminate his parental rights in May 2011.

YFS social worker assistant Karen Logan-Rudisill, who supervised respondent-mother's visitation with the children, testified that respondent-father "called during one of the visits . . . to speak with the boys" approximately four or five months prior to the 15 March 2012 termination hearing. He never

---

[3] The record reflects that respondent-father telephoned the children's foster parents from Mexico on or about 21 March 2011 and gave them his phone number.

contacted Ms. Logan-Rudisill regarding the children.

At the hearing held on remand on 18 July 2013, respondent-father testified that he re-entered the United States without documentation in April 2012, and obtained employment and leased an apartment in Charlotte in May 2012. He confirmed that he had been deported in September 2010 and had spoken with respondent-mother and the children "[o]ne time" while in Mexico. Respondent-father claimed he did not contact YFS or the foster parents from Mexico because he "lost the number[.]" He also acknowledged that he had not "provided any monies in support of [the] children since they've been in foster care for nearly four years[.]"

Respondent-father specifically objects to the district court's finding that he "made no efforts to keep updated on the children while they have remained in custody." To the extent the evidence showed that he contacted respondent-mother and spoke to the children on one occasion while he was in Mexico, we agree that finding of fact 52 is not strictly accurate. "However, to obtain relief on appeal, an appellant must not only show error, but that . . . the error was material and prejudicial, amounting to denial of a substantial right that will likely affect the outcome of an action." *Starco, Inc. v.*

*AMG Bonding and Ins. Servs.*, 124 N.C. App. 332, 335, 477 S.E.2d 211, 214 (1996). As set forth above, the evidence showed that a single phone call to respondent-mother represented respondent-father's only effort to contact or keep apprised of his children during the relevant time period.[4] Therefore, the court's error is harmless. *Cf. In re Estate of Mullins*, 182 N.C. App. 667, 670-71, 643 S.E.2d 599, 601 ("In a non-jury trial, where there are sufficient findings of fact based on competent evidence to support the trial court's conclusions of law, the judgment will not be disturbed because of other erroneous findings which do not affect the conclusions.") (quotation marks and citation omitted), *disc. rev. denied*, 361 N.C. 693, 652 S.E.2d 262 (2007).

This Court has found willful abandonment "where a parent withholds his presence, his love, his care, the opportunity to display filial affection, and willfully neglects to lend support and maintenance." *In re D.J.D.*, 171 N.C. App. 230, 241, 615 S.E.2d 26, 33 (2005) (citation, quotation marks, and brackets omitted). We have further held that a parent's single attempt

---

[4] To the extent that respondent-father claims "close contact" with YFS and the children prior to September 2010, we note this evidence falls outside the six-month period at issue under N.C. Gen. Stat. § 7B-1111(a)(7).

to contact a child during a period of incarceration does not preclude a finding of willful abandonment under N.C. Gen. Stat. § 7B-1111(a)(7). *In re McLemore*, 139 N.C. App. at 431, 533 S.E.2d at 511 (citing *In re Harris*, 87 N.C. App. 179, 184, 360 S.E.2d 485, 488 (1987)). Both the evidence and the court's findings reflect that respondent-father's arrest and subsequent deportation did not prevent him from communicating with his children and YFS. In light of respondent-father's single phone call to respondent-mother and his children during the six months immediately preceding 9 May 2011, the district court did not err in finding that he willfully abandoned the children. *See id.*; *In re Searle*, 82 N.C. App. at 276-77, 346 S.E.2d at 514.

Having upheld the adjudication under N.C. Gen. Stat. § 7B-1111(a)(7), we need not address the remaining grounds found by the district court for terminating respondent-father's parental rights. *See In re P.L.P.*, 173 N.C. App. at 9, 618 S.E.2d at 246.

## IV. Respondent-mother's Appeal

Respondent-mother challenges the court's conclusion that she neglected the minor children under N.C. Gen. Stat. § 7B-1111(a)(1) (2013). A neglected juvenile is one who, *inter alia*, "does not receive proper care, supervision, or discipline . . .;

or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare[.]" N.C. Gen. Stat. § 7B-101(15) (2013). In order to support an adjudication under N.C. Gen. Stat. § 7B-1111(a)(1), "[n]eglect must exist at the time of the termination hearing[.]" *In re C.W.*, 182 N.C. App. at 220, 641 S.E.2d at 729. Where "the parent has been separated from the child for an extended period of time, the petitioner must show that the parent has neglected the child in the past and that the parent is likely to neglect the child in the future." *Id*. The determination that a child is neglected is a conclusion of law. *In re Helms*, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675 (1997).

In support of its conclusion under N.C. Gen. Stat. § 7B-1111(a)(1), the district court found as follows:

> 7.  . . . The primary issues which led to these children being placed in YFS custody were the mother's housing instability, domestic violence between the respondent-mother and [respondent-father]. Lack of appropriate supervision of the children and inappropriate discipline of the children were primary issues as well.
>
> 8.  [Brandy, Vincent, Ronald, and Adam] were adjudicated neglected and dependent on December 10, 2009 . . . .
>
> 9.  . . . Yvonne was adjudicated neglected and dependent on 5 May 2010.

10. . . . The respondent-mother was to engage in mental health treatment, obtain substance abuse assessment, obtain domestic violence assessment, participate in parenting education, visit with the children, maintain contact with YFS social worker, attend the children's appointments, maintain stable housing, and obtain employment in order to provide for the children.

. . . .

14. The respondent-mother was required to obtain therapy to establish that she could independently care for the children. The mother has suffered significant trauma in her life. The respondent-mother has not been able to complete therapy in more than 22 months that the children have been in YFS custody.

15. The respondent-mother has been inconsistent with her mental health treatment and psychotherapy. The respondent-mother attended psychotherapy sessions with Dr. Alicia Ceballos through September 2010. The respondent-mother did not attend her psychotherapy sessions consistently in October and November 2010. The respondent-mother did not see Dr. Ceballos between November 2010 and March 2011. The respondent-mother has not been consistent in reporting to Dr. Castro for mental health medication and management.

16. The respondent-mother was ordered to complete the NOVA domestic violence program pursuant to this Court's order of 9 June 2010. The mother completed two sessions of NOVA, but was terminated on 10 October 2010 for non-compliance. The YFS social worker

obtained the respondent-mother's reinstatement in NOVA on 20 October 2010. The respondent-mother was terminated from NOVA for a second time on 7 December 2010 for non-compliance.

17. The respondent-mother was ordered by the Court on 9 June 2010 to complete [an] adult literacy program. The respondent-mother has not completed [an] adult literacy program.

18. The respondent-mother used corporal punishment with the children when they were in her care.

19. The respondent-mother completed parenting education through family sessions conducted by Traci Withrow; however, the respondent-mother only attended and participated in one shared-parenting visit, although [she] was offered several shared-parenting visits. The respondent-mother was provided with unsupervised visitation in December 2010, but these visits were discontinued after [she] lost the apartment she was living in due to lack of income.

. . . .

25. The respondent-mother has not attended the children's education and medical appointments although offered by the department.

. . . .

31. [Respondent-mother] has been . . . earning $300 per weekend per her own testimony for the past five months. [She] has not provided any monies for the support of the children to YFS or to the foster parents.

32. The mother has provided some small amounts of money to the children on occasion during visits. . . . These funds could be considered gifts and are not signs of actively supporting the children financially.

. . . .

46. Nothing has changed [since this Court's opinion in *In re B.S.O.*] other than [respondent-father] has [reentered] the country illegally.

. . . .

49. Upon [respondent-father]'s return to the United States in March 2012, [he] resumed his relationship with [respondent-mother].

50. [Respondent-father] has been providing [respondent-mother] with a stable place to stay since his return to Charlotte. The evidence does not establish that [he] has an emotional attachment to [respondent-mother,] and they are not married.

. . . .

55. The inconsistency of the respondent mother in complying with mental health therapy has not changed.

56. If the children were to return to the home of the respondent mother and [respondent-father], [she] would again be the primary caretaker of the children, and that would not resolve the issue of improper supervision that led to the three oldest children being placed in YFS custody approximately four years ago nor the issues

of domestic violence that existed in her relationships.

57. The probability of the repetition of neglect is high in that the respondent mother has not addressed her mental health issues and [respondent-father] is not willing to change his level of involvement in the daily care of the children.

. . . .

61. [Respondent-father] has provided a stable place to stay for [respondent-mother], but [she] has not addressed her mental health needs through consistent therapy and has not completed NOVA. Her relationship with [respondent-father] is one of convenience and is not stable.

. . . .

66. The juveniles have been in YFS custody for approximately four years and the respondent mother has not addressed the issues that led to the children being placed in YFS custody. . . . .

To the extent respondent-mother does not contest these findings on appeal, they are deemed to be supported by competent evidence. *Koufman*, 330 N.C. at 97, 408 S.E.2d at 731. We address respondent-mother's exceptions to the court's fact-finding below.

Challenging a portion of finding of fact 14, respondent-mother argues that there was no evidence that she was required to obtain mental health therapy "to establish that she could

independently care for the children." Respondent-mother notes that no such purpose was explicitly articulated in her family services agreement ("FSA") or F.I.R.S.T.[5] assessment, or by any of her therapists.

As part of her FSA, respondent-mother agreed to submit to a F.I.R.S.T. assessment and follow its recommendations. The assessment resulted in respondent-mother's referral to CMC-Randolph for a mental health evaluation. Psychotherapist Alicia Ceballos, PhD, evaluated respondent-mother at CMC-Randolph in May 2011. Dr. Ceballos testified that the purpose of the referral was to ensure respondent-mother's compliance "with her medication regimen, and she was to acquire positive coping skills, especially emotion regulation skills in order to relate to her children and her partner."

Dr. Ceballos found that respondent-mother exhibited traits of borderline personality disorder, including a "very intense fear of abandonment[,]" "all or nothing thinking and functioning out of emotions[,]" "impulsivity relating to the abuse of alcohol, the intense anger and difficulty managing the anger[,]" and a pattern of what appeared to be instability in her effective relationships." Dr. Ceballos developed a treatment

---

[5] An acronym for Families in Recovery Stay Together.

plan for respondent-mother which included the goal of "learn[ing] skills in order to relate better with her partner and her children. In particular, improve her regulation of her anger."

Although respondent-mother's mental health treatment was not explicitly geared toward raising her children "independently[,]" abundant evidence shows that her mental health issues were inextricably linked to the conditions that led to the children's removal from her home and their adjudication as neglected and dependent. Respondent-mother's emotional instability and unregulated anger manifested themselves, *inter alia*, in her use of violence in the home with her children and respondent-father, as well as a series of unstable and volatile romantic relationships both before and after respondent-father's deportation to Mexico. In adjudicating Yvonne neglected in May 2010, the district court found that "[t]he primary issue" at the time of the four older children's adjudications "was the mother's mental health treatment." The court's orders have consistently emphasized respondent-mother's need to follow through with her mental health treatment. As the uncontested findings show—specifically, findings 15, 55, and 61—respondent-mother failed

to do so. The ultimate relevance of this programming was necessarily to prepare respondent-mother to properly care for her children. Finding 14 is a reasonable short-hand summary of this evidence.

Respondent-mother next objects to finding 18 that she used corporal punishment with the minor children when they were in her care. While conceding "there is evidentiary support for the finding" as to incidents prior to the children's removal from her home in 2009, she contends there is no evidence that she used corporal punishment after YFS took custody of the children.

Finding 18 does not purport to refer to corporal punishment by respondent-mother after the children's removal from her home. The court was free to consider respondent-mother's conduct toward the children leading to their prior adjudication as neglected. *See In re Ballard*, 311 N.C. 708, 713, 319 S.E.2d 227, 231 (1984) ("[I]n ruling upon a petition for termination of parental rights for neglect, the trial court may consider neglect of the child by its parents which occurred before the entry of a previous order taking custody from them.") Such evidence was relevant in assessing the likelihood of future neglect for purposes of N.C. Gen. Stat. 7B-1111(a)(1), particularly where respondent-mother's use of violence in the

home and anger control issues were of central concern.

Respondent-mother claims the evidence does not support findings 25 and 31 that she did not attend her children's medical and educational appointments or "provide[] any monies for the support of the children to YFS or to the foster parents." Although we agree with respondent-mother that these findings vary slightly from the evidence, the discrepancies are inconsequential.

Asked about respondent-mother's attendance at the children's medical and educational appointments, Ms. Peperak testified that respondent-mother "attended one WIC appointment and one pediatrician appointment for the girls" and just one "school, an IEP meeting, for V[incent]" in December 2010. Moreover, respondent-mother "never asked [Ms. Peperak] about [the children's] appointments[.]" When queried about her own attendance, respondent-mother responded, "I remember I went to some of the medical appointments for the boys. I don't remember the exact dates of when that happened." The evidence thus showed that respondent-mother evinced little interest in the children's appointments and for the most part did not attend them.

Regarding respondent-mother's monetary contributions to YFS

and the foster parents, Ms. Peperak testified that she had never "provided [YFS] with any money for the children's care[,]" despite reporting that she was earning $300 to $400 per week selling food beginning in October 2011. At a permanency planning hearing held on 15 March 2012, respondent-mother confirmed that she had paid nothing toward the support of the children, even though she was then earning at least $300 per weekend.

Ms. Logan-Rudisill testified that respondent-mother "on occasion" gave $10 to the girls' foster parents and $20 to the boys' foster parents. Respondent-mother would also occasionally give the children one-dollar bills. At the hearing held on remand on 18 July 2013, respondent-mother claimed that, within the past year, she had given the children $600 "once [when] I saw them at McDonald's." On cross-examination, however, respondent-mother explained that she "ran into" the children's foster mother, Ms. H. at a McDonald's in August 2012 and that she then bought "items for the children in August 2012 with Ms. [H.]" In response to the next question posed by counsel, respondent-mother confirmed that she "did not provide any financial support for the children between March 2012 and May 2013[.]" We note that the court did find that respondent-mother

"has provided some small amounts of money to the children on occasion during visits.  . . . These funds could be considered gifts and are not signs of actively supporting the children financially."

The evidence fully supports the district court's finding that respondent-mother paid nothing to YFS toward the children's cost of care.[6]  While the evidence does show her payment of occasional small sums to the foster parents, the corresponding error in finding 32 was harmless.  The court's remaining findings make clear that it did not base the adjudication under N.C. Gen. Stat. § 7B-1111(a)(1) on the absence of such payments from respondent-mother to the foster parents.  *See generally In re T.M.*, 180 N.C. App. at 547, 638 S.E.2d at 240 (stating that "erroneous findings unnecessary to the determination do not constitute reversible error").

Respondent-mother next objects to finding 56, contending that "[t]he evidence does not show that there would be improper supervision of the children if they were returned to the home of the parents."  We find no merit to this claim.  The evidence shows that respondent-mother has failed to address her mental

---

[6]  The court found that YFS's total expenditures for the five children exceeded $315,000.

health issues and emotional instability. She also failed to complete domestic violence treatment at NOVA and was terminated three times for excessive absences. Although respondent-mother improved her parenting skills by working with child and family psychotherapist Traci Withrow between November 2009 and November 2010, Ms. Logan-Rudisill saw her skills "decline" after respondent-father was deported. Even after respondent-father's return, respondent-mother maintained a "passive" parenting style and had difficulty managing multiple children. Overall, Ms. Logan-Rudisill saw no improvement in respondent-mother's "ability to manage the five children" during her involvement in the case.

The evidence and the district court's findings further reflect the tenuous nature of respondents' relationship and respondent-mother's dependence on respondent-father. After respondent-father was deported, respondent-mother resumed her pattern of instability in her relationships and housing. In July 2011, she disclosed to Ms. Logan-Rudisill that she had been involved in a domestic violence incident with her then partner, Kelvin R., and showed Ms. Logan-Rudisill her "scratches and bruises." Ms. Peperak testified that respondent-mother had at least eleven different residences between December 2010 and

March 2012 and "demonstrated a pattern of relationships not only with boyfriends but also with roommates and friends that have been unhealthy and have included violence." Finally, we note that respondent-mother does not contest the findings that respondent-father has "[re]entered the country illegally" and that "[h]er relationship with [him] is one of convenience and is not stable." Accordingly, the evidence amply supports the court's finding 56 that respondent-mother had not resolved the issues of improper supervision and domestic violence that led to the children's removal from her home.

Respondent-mother also challenges the court's "ultimate finding" in finding 57 that "[t]he probability of the repetition of neglect is high" in light of her failure to "address[] her mental health issues" and respondent-father's unwillingness "to change his level of involvement in the daily care of the children." We believe the evidence and the court's evidentiary findings are sufficient to show a probability of a repetition of neglect. More than three years after the children's removal from her home, respondent-mother had yet to confront the primary issues leading to their removal. Moreover, finding 57 is consistent with respondent-father's testimony "that if the children were to come back home, [respondent-mother] will be

dedicated to their care and I would go out to work."

Where "different inference[s] may be drawn from the evidence, [the trial court] alone determines which inferences to draw and which to reject." *In re Hughes*, 74 N.C. App. 751, 759, 330 S.E.2d 213, 218 (1985). We conclude that the evidence and the court's evidentiary findings support a reasonable inference that neglect would likely recur if the children were returned to respondent-mother.

Respondent-mother also challenges the adjudication under N.C. Gen. Stat. § 7B-1111(a)(1) as unsupported by the district court's findings of fact. However, the court found both a prior adjudication of neglect as to each child and a high probability of a repetition of neglect, as required. *See In re Ballard*, 311 N.C. at 714-15, 319 S.E.2d at 231-32. Therefore, this assignment of error is overruled.

Having affirmed the adjudication of grounds to terminate respondent-mother's parental rights for neglect, we do not address the remaining grounds found by the district court. *See In re P.L.P.*, 173 N.C. App. at 9, 618 S.E.2d at 246.

### V. Conclusion

The petitions filed by YFS provided sufficient notice to respondent-father to allow an adjudication of willful

abandonment under N.C. Gen. Stat. § 7B-1111(a)(7).  The evidence and the district court's findings support an adjudication of grounds to terminate respondent-father's parental rights under N.C. Gen. Stat. § 7B-1111(a)(7), and of grounds to terminate respondent-mother's parental rights for neglect under N.C. Gen. Stat. § 7B-1111(a)(1).  Therefore, we affirm the order terminating respondents' parental rights.

AFFIRMED.

Judges CALABRIA and DAVIS concur.