IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-743

Filed 2 April 2025

Forsyth County, No. 21JT227

IN THE MATTER OF: R.A.X.

Appeal by respondent-appellant father from order entered 20 May 2024 by Judge Thomas W. Davis V, in District Court, Forsyth County. Heard in the Court of Appeals 18 March 2025.

*Assistant County Attorney Melissa Starr Livesay for petitioner-appellee Forsyth County Department of Social Services.*

*Matthew D. Wunsche for the guardian ad litem.*

*Richard Croutharmel for respondent-appellant father.*

STROUD, Judge.

Respondent-father appeals from the trial court's Order terminating his parental rights as to his minor child. Respondent-father argues the trial court erred in concluding the child was neglected under North Carolina General Statute Section 7B-1111(a)(1) and that respondent-father willfully left the minor child in foster care for more than twelve months without sufficient progress to effect the minor child's return home under North Carolina General Statute Section 7B-1111(a)(2). As the trial court properly terminated respondent-father's parental rights under North Carolina General Statute Section 7B-1111(a)(2) for willful failure to make progress, we affirm the trial court's termination Order.

## I.    Background

Rex[1] was born in October 2020 in Forsyth County, North Carolina.   On 15 December 2021, the Forsyth County Department of Social Services ("DSS") filed a juvenile petition alleging Rex was neglected since he "does not receive proper care from his parents and lives in an environment injurious to his welfare."   Specifically, DSS alleged Rex's mother[2] and Rex were "out at night without a coat or shoes on while [the mother] was knocking on apartments trying to find a place for her and [Rex] to stay for the night[,]" Rex's lips were turning blue, and the mother "uses drugs and prostitutes in the presence of [Rex], and it was unknown where they were staying."   An order for nonsecure custody was entered 17 December 2021 placing Rex in the custody of DSS.   Father was initially unknown but was identified after DNA paternity testing; the trial court found Father is "the natural and biological father" of Rex.   Father is an undocumented immigrant from Guatemala.

The initial adjudication hearing was conducted on 11 February 2022 and on 1 April 2022 the trial court entered an order adjudicating Rex as neglected.   At the hearing, Father "stated he could not provide care for [Rex] and did not have any kinship care placement to offer[.]"   The trial court also noted a child and family team meeting on 14 December 2021 where Father stated "he is unable to provide adequate housing or physical care for [Rex] . . . due to lack of proper identification" and that

---

[1] A pseudonym is used to protect the identity of the minor child.
[2] Rex's mother is not a party to this appeal.

"he rents a room from his boss, [and] because his boss does not want to be involved with DSS" Rex could not stay there with Father. Father also admitted to "a history of substance abuse treatment or domestic violence treatment." The trial court ordered Father to take parenting classes; "[o]btain and maintain stable housing that meets the needs" of Rex; "[p]articipate in a Substance Abuse assessment and follow all recommendations[;]" "[o]btain and maintain proper legal identification[;]" demonstrate an ability to meet Rex's needs; "[d]emonstrate that he can maintain a safe, stable home which is free from domestic violence and from substance use[;]" complete a domestic violence assessment and comply with recommendations; and sign a release allowing DSS and Rex's Guardian *ad Litem* ("GAL") to have access to Father's mental health and substance abuse treatment information.

The first permanency planning hearing was conducted on 6 May 2022 and the trial court found Father had started parenting classes and so far he had not missed a session; participated in substance abuse classes; has "begun to acknowledge concerns of [Rex's] basic and developmental needs[;]" and complied with the request to sign releases allowing DSS and Rex's GAL access to his mental health and substance abuse treatment information. However, Father did not obtain and maintain stable housing as he was "currently living at a residence he does not want to share with" DSS and stated he was "unable to secure housing as he does not have an ID" but was going to "receive a passport identification from Guatemala." The trial court also noted DSS gave Father "various resources located in Forsyth and Guilford

County that could assist with the immigration process." The trial court ordered the primary reunification plan to be reunification with a secondary plan of adoption.

The trial court held a second permanency planning hearing on 10 August 2022. The trial court again noted Father's continued progress with parenting and substance abuse classes; however, Father's housing situation had not changed. Father was "currently living at a residence he d[id] not want to share with" DSS. DSS had given Father information about a "Fathers Are Parents Too" class, which can be offered in Spanish, and has "funding tied that could assist him with maybe making a down payment on an apartment or house" but Father "has not called to enroll or made efforts to engage in the program in order to be able to receive the available assistance." Father received a passport from Guatemala in April 2022. A social worker "has provided [Father] with various resources located in Forsyth and Guilford County that could assist him with the immigration process" but he "failed to acknowledge [the] information provided by not responding."

A third permanency planning hearing was held in November 2022 and February 2023. A K'iche language interpreter was present with Father during the November 2022 and February 2023 hearings as the Spanish interpreter suggested at the end of the August 2022 hearing this would be beneficial to Father; K'iche is a "specific dialect most common to Guatemala[,]" Father's home country. While Father continued parenting classes, visited with Rex, and showed an interest in Rex's needs, he again was unable to "identif[y] safe and stable housing for" Rex during this

hearing. The trial court noted that Father finally provided his current address during this hearing, but he did not "have a separate living area and [he] sle[pt] in the living room on the floor in front of the kitchen." Parenting Path was trying to help Father obtain housing, but

> Parenting Path staff reported that they have tried to work with [Father] to get the needed documentation together to request a green card for citizenship, however he has yet to provide the requested information. Without proof of citizenship and employment, Parenting Path is unable to assist [Father] with obtaining housing.

The permanent plan after this hearing was changed to a primary plan of adoption with a secondary plan of guardianship due to Father's continued inability to provide stable housing for Rex.

The fourth and final permanency planning hearing was held on 2 August 2023. The trial court again noted that Father provided his address at the prior hearing but would not allow a home visit by DSS since Rex "would not be residing there and therefore [Father] does not want a home visit to occur." Father stated he was continuing to try to find housing but was unable to provide documentation of his efforts to DSS. The trial court stated Father was in the same position as to housing as he was in December 2021, when DSS first got involved with Rex. The trial court noted Father was aware of the requirement to obtain stable housing but his position is that there is nothing he can do, Father stated "[t]here is no solution."

On 3 November 2023, DSS filed a motion to terminate Father's parental rights.

DSS alleged grounds for termination under North Carolina General Statute Section 7B-1111(a)(1) for neglect and 7B-1111(a)(2) for willfully leaving Rex in foster care for more than twelve months without showing to the court that he has made reasonable progress in correcting the conditions which led to Rex's removal. Father's inability to provide safe and stable housing for Rex was the main basis alleged for termination in the motion.

The termination hearing was held on 8 April 2024 and on 20 May 2024 the trial court entered an Order terminating Father's parental rights under North Carolina General Statute Sections 7B-1111(a)(1) and (a)(2). Father, the social worker, and the GAL all testified at the termination hearing. The trial court found that "[i]n the 845 days that have passed in [Rex]'s life since he was removed from his mother's care – as [Father] never provided full-time care to [Rex] prior to his removal – [Father] has not made any progress in securing safe and appropriate housing for himself and" Rex.

The trial court noted that the social worker visited Father's home but was unable to meet the other residents of the home and Father "has not provided the names or identifying information for the other residents of the home." At some points Father was sleeping on the floor, but by the time of the termination Order, Father "was sleeping on a couch in the shared living room of the apartment." The trial court outlined the various times it was explained to Father he must have safe housing before taking custody of Rex and that it could be appropriate for Father and Rex to

live in a housing arrangement "without a formal rental or lease agreement" but that DSS would be required to "check out the home and the people who lived in it." The trial court found Father had a monthly surplus of $2,000.00 after monthly expenses for the past year and before that he had a monthly surplus of $1,200.00, which was an adequate amount "to obtain a basic, safe home" for Rex.

Father identified his lack of identification, undocumented status, and not speaking English as the main barriers to obtain housing, but "acknowledged in his testimony [at the hearing] that the primary obstacle he encountered in obtaining housing was his criminal record." Father submitted an application for housing in the Fall of 2022 but was denied due to his criminal record, and Father "did not pursue other apartments to the point of submitting applications, assuming that he would be rejected for the same reasons." DSS provided Father "with information for ten (10) non-profit agencies and churches that offer housing assistance for undocumented individuals, including undocumented individuals with criminal histories." Finally, the trial court noted Father was initially provided a Spanish language interpreter and was then provided a K'iche language interpreter during the permanency planning hearings and that Father understood clearly the requirement to find safe housing. Father filed notice of appeal on 10 June 2024.

## II. Willful Failure to Make Progress

Father argues

> [t]he trial court reversibly erred in concluding the existence

of the TPR ground of willfully leaving Rex in foster care for more than 12 months with insufficient progress to effect his return home under N.C. Gen. Stat. § 7B-1111(a)(2) because the trial court used [ ]Father's undocumented immigrant status as the sole basis for concluding the existence of this TPR ground and the trial court operated under a misapprehension of law.

We disagree.

## A. Standard of Review

We review a district court's adjudication under N.C.G.S. § 7B-1111(a) to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law. Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal. A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding. The issue of whether a trial court's adjudicatory findings of fact support its conclusion of law that grounds existed to terminate parental rights pursuant to N.C.G.S. § 7B-1111(a) is reviewed de novo by the appellate court. Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the trial court.

*In re M.T.*, 285 N.C. App. 305, 336, 877 S.E.2d 732, 753-54 (2022) (citations, quotation marks, and brackets omitted).

## B. Findings of Fact

First, we note the trial court's Order was thorough and well-organized, clearly delineating its findings related to Rex's mother and Father separately as well as clearly identifying its findings addressing adjudication and disposition. Father did

not challenge 51 of the trial court's detailed findings of fact relevant to adjudication of his parental rights. The trial court made 57 findings of fact regarding Father for purposes of adjudication of termination of parental rights.[3] Father challenges six of these findings as unsupported by the evidence. We will address each of the challenged findings.

### 1. *Finding 80*

Father first challenges finding 80, which states he "contacted two (2) of those ten (10) agencies [that offer housing assistance for undocumented individuals]. When he did not immediately receive a call back from one of those two agencies, [Father] took no further action to follow up. He made no effort to contact the other eight (8) agencies." Father first testified he did not remember being given a list of ten agencies. He stated he only remembered "the number for the church that [he] called, and they didn't answer - - they didn't call [him] back. And then [social worker Choplin] gave [him] another number for another office, and they didn't answer." Then when asked "[d]id the social worker give you a different agency to contact after that church[,]" Father answered "[f]rom what I recall, no. Perhaps I have forgotten."

Social worker Choplin testified about giving Father a list of ten to fifteen programs to assist with his housing, but stated Father "did not follow up with any of them until later, when he followed up with the church" and then stated she was not

---

[3] Findings 1-40 address general procedural matters and adjudication as to the mother only.

"aware of [Father] making efforts to contact any of the other 10 to 15 programs that [she] identified for [Father.]" Social worker Choplin testified she spoke with the Church of Shattalon and Eureka Ministries on behalf of Father and helped Father learn how to use e-mail to apply for housing through these programs. As social worker Choplin gave Father a list of ten to fifteen agencies to contact for housing assistance, Father testified he did not remember receiving any information other than the two agencies social worker Choplin identified specifically, and social worker Choplin was not aware Father made efforts to use any of the other agencies given to him by social worker Choplin, this finding is supported by the evidence. The trial court must assess the credibility of the witnesses and draw inferences therefrom. *See In re R.H.*, ___ N.C. App. ___, ___, 906 S.E.2d 829, 834 (2024) ("In the context of termination of parental rights proceedings, the proper inquiry is often fact-dependent and the trial court, as a fact-finding court, is in the best position to determine the credibility of the witnesses before it and make findings of fact. Thus, the trial court determines the weight to be given the testimony and the reasonable inferences to be drawn therefrom. If a different inference may be drawn from the evidence, the trial court alone determines which inferences to draw and which to reject." (citations and quotation marks omitted)).

### 2. *Finding 81*

Finding 81 states Father "did not take reasonable steps to pursue housing options that were made known to him and which could have assisted him, despite his

criminal record, which he identified as a barrier to securing safe housing." Father argues "he did take reasonable steps to pursue housing options." This argument is closely related to Father's challenge to finding 80, which we consider supported by the evidence, showing Father contacted only two out of ten housing assistance resources given to him by social worker Choplin. We recognize Father testified on direct examination he paid an application fee at Vista Realty but was denied due to his criminal record and that he contacted a few other places, although the record is unclear as to the number of applications he paid for and submitted. However, on cross-examination, Father was unable to name any of the locations or offices he applied to. Father then stated once an office tells him "they have to check [his] records, then [he doesn't] apply because [he has] already been rejected[.]" Father then admitted, even after being denied for having a criminal record, he never asked DSS for help finding housing that would allow him even with a criminal record. We also note Father had over two years to secure housing instead of a limited time in which it would not be possible to complete this process. Much of finding 81 required the trial court to assess the credibility of Father and social worker Choplin, and finding 81 is supported by the evidence. *See id.*

### 3. *Finding 87*

As to finding 87, Father argues he did not testify at the termination hearing he understood Spanish "perfectly" as found by the trial court. Finding 87 specifically states:

> Social Worker Choplin has communicated with [Father] outside of court in Spanish. While this is not [Father's] first language, he has stated on numerous occasions that he understands Spanish. When asked during his testimony today about communications that occurred in Spanish, [Father] responded that he understood, even stating he understood "perfectly." Further, the record reflects that the need to obtain a safe and appropriate living arrangement for [Rex] and to secure childcare was explained to [Father] at hearings with the Ki'che (sic) interpreter.

DSS and the GAL recognize the trial court used a different word, stating Father actually testified to understanding Spanish "completely" instead of "perfectly." Specifically, in response to a question about his criminal record, Father testified "[t]hat's what they told me, not in English, in Spanish. *So I was able to understand completely what they were telling me.*" (Emphasis added.) While Father did not use the word "perfectly" as the trial court found, he did indicate he understood Spanish "completely." The other parts of finding 87, and other uncontested findings of fact, also indicate Father understood Spanish. Webster's dictionary defines "complete" as "3. highly proficient" and "perfect" as "2: expert, proficient[.]" Merriam-Webster's Collegiate Dictionary 254, 919 (11th ed. 2003). Thus, there is no meaningful difference in the words "completely" and "perfectly" as used by Father in his testimony and the trial court in finding 87.

And to the extent Father suggests on appeal that not having a K'iche interpreter outside of court proceedings contributed to his failure to find safe and stable housing, this suggestion is not supported by the unchallenged findings of fact.

The trial court's Order thoroughly addressed the question of Father's native language and his understanding of Spanish in findings 82 through 88, but he challenges only a small portion of finding 87. For example, finding 84 states "[p]rior to August 2022, [Father] participated in and completed programs to include Prime for Life, the Nurturing Parenting Program, and Domestic Violence Treatment provided in Spanish or with the aid of a Spanish interpreter. [ ]DSS and the [c]ourt accepted [Father's] completion of those programs." Finding 87 is supported by the evidence despite the trial court quoting the word "perfectly" instead of "completely."

### 4. Finding 89

Father challenges finding 89 by arguing that having a babysitter was not part of his case plan, was "irrelevant given he had no housing for Rex and the trial court was not going to place Rex in his custody until he had housing[,]" and that Father examined one daycare but could not afford it. But this challenge does not really address the substance of finding 89. Finding 89 states:

> At the hearing today, when asked about how [Rex] will be cared for while he is at work, [Father] stated he will seek a daycare or a babysitter. [Father] doesn't have an identified daycare or an identified babysitter for [Rex] today. The expectation that a daycare spot or an appropriate babysitter will simply materialize upon [Rex's] return is not realistic.

Finding 89 does not state that finding a babysitter or day care was part of Father's case plan but having a babysitter or day care available was clearly relevant. Father's case plan required him to "demonstrate the ability to meet the basic,

developmental, and medical needs of [Rex.]  Rex was three and a half years old at the time of the hearing."  Father was working full-time, and it is obvious that one of the things a parent must do to meet the "basic needs" of a child who is age three is to have a reliable babysitter or day care to take care of the child while the parent is working.  This challenge is without merit.

### 5.  *Finding 90*

Father challenges finding 90 as "pure speculation" and is "therefore erroneous."  Finding 90 states:

> Were the court to return custody of [Rex] today, one of two things would happen:
>
> [Rex] would go to a situation [Father] himself acknowledged isn't suitable for [Rex], in an environment with an unknown number of unknown adults and no plan for how [Rex] will be cared for when [Father] goes to work tomorrow.
>
> Alternatively, [Rex] would be left in the care of [the mother]. This was the plan reported to [the mother] in her conversation with Social Worker Choplin in January 2024. As it is the only clear plan for [Rex's] care to have been identified by either parent, and as there has been at least some amount of continued communication between [Father] and [the mother] during the case, the [c]ourt gives some weight to the evidence that this would be the outcome.

Father "denies that he would rely on [the m]other to help him with Rex's care if he regained custody of Rex."  Father also argues that he "admitted that his current residence was inadequate for Rex.  Thus, there was no evidence [ ]Father would

attempt to house Rex at his current residence."

Father challenges the first part of finding 90, arguing there "was no evidence [ ]Father would attempt to house Rex at his current residence," but based on the evidence, the trial court had no reason to believe he would house Rex anywhere else. Father recognized his current residence was in a home with several adults he would not identify and DSS could not do background checks on, and he did not have a plan for care for Rex when he was working. He had been living in similar circumstances during the entire time Rex was in DSS custody, and he had been unable to find other housing. It is entirely reasonable for the trial court to infer that Father would leave Rex in the care of one or more of the "unknown adults" when he was working, if he had no babysitter or daycare. *See In re R.H.*, ___ N.C. App. at ___, 906 S.E.2d at 834.

Further, as to the second part of finding 90 that Rex would instead be left in the care of the mother, as "this was the plan reported to . . . Social Worker Choplin in January 2024[,]" and "it is the only clear plan for [Rex's] care to have been identified by either parent," and since Father and the mother were still in contact, the court "gives some weight to the evidence that this would be the outcome." Father argues only that he denies this assertion but does not point to any testimony or evidence to the contrary. Instead, social worker Choplin testified Father gave her the mother's phone number, the mother was living on the same street as Father, and

> [w]hen talking to [the mother] at the jail, I asked her if her and [Father] were still romantically involved. She stated "yes." She said "He probably doesn't want me telling you

this," and further went to say that she sees [Father] pretty often. And then on the 4th of January, when we discussed it as well, I asked her if [Rex] was back into either of their care if they would parent together. She stated "yes," and they also plan to get married.

Again, the trial court could reasonably infer that Father may leave Rex in the care of the mother when he was working.[4] *See id.* The challenges to finding 90 are overruled.

### 6. *Finding 92*

As to finding 92, Father does not actually challenge the substance of the finding, but states his inability to obtain housing suitable for Rex was based on his immigration status, and

> [t]his Court should hold that it is improper to terminate parental rights where the only issue [ ]Father did not overcome on his case plan was finding adequate housing and the only reason he could not overcome that issue was due to his undocumented immigration status in the United States.

Finding 92 states:

> However, despite those actions, [Father] has not changed the fundamental issues underlying [Rex's] removal from his care and custody. As of April 2024, [Father] has had two years and four months, well over the twelve months to permanence, to obtain a safe living arrangement for [Rex] and provide a clear plan of care for [Rex]. [Father's]

---

[4] Other portions of the Order addressed the trial court's concerns about the mother. Unchallenged findings state that the mother "was leaving [Rex] in unsafe situations while she engaged in prostitution and used drugs." She also had a "mental health crisis but failed to accept help" and had "jeopardiz[ed] her own safety and further jeopardize[ed] her son's." When Rex was removed from the mother's care by DSS, Father was informed that Rex "was exposed to unsafe conditions in [the mother's] care" but "[Father] did not act to intervene and informed [ ]DSS he was unable to care for his child." The trial court also found that Father "knew or should have known of the conditions his son was experiencing in [the mother's] care" even before DSS informed him of this situation.

position has remained essentially the same as at the time
of [Rex's] removal.

Father does not argue the substance of finding 92 is unsupported by the evidence, and this finding is supported by the evidence. We will instead review Father's argument as to his inability to find housing and the effect of his immigration status in our discussion of the trial court's conclusion of willful failure to make progress below. Finding 92 is supported by the evidence.

## C. Conclusion of Willful Failure to Make Progress

Father contends the trial court erred in concluding there were adequate grounds for termination of his parental rights under North Carolina General Statute Section 7B-1111(a)(2) since "the trial court used [ ]Father's undocumented immigrant status as the sole basis for concluding the existence of this TPR ground and the trial court operated under a misapprehension of law." Although Father's undocumented immigrant status was a fact which complicated Father's ability to find housing, according to the Order, it was not part of the basis for the trial court's conclusion. We disagree with Father's contention that his immigration status played a substantial role in the trial court's determination and conclude the trial court properly terminated Father's parental rights under North Carolina General Statute Section 7B-1111(a)(2) for willful failure to make progress.

North Carolina General Statute Section 7B-1111(a)(2) states:

> (a) The court may terminate the parental rights upon a
> finding of one or more of the following:

. . . .

> (2) The parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile. No parental rights, however, shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty.

N.C. Gen. Stat. § 7B-1111(a)(2) (2023).

> [A]n adjudication under N.C.G.S. § 7B-1111(a)(2) requires that a child be "left in foster care or placement outside the home pursuant to a court order" for more than a year at the time the petition to terminate parental rights is filed. This is in contrast to the nature and extent of the parent's *reasonable progress*, which is evaluated for the duration leading up to the hearing on the motion or petition to terminate parental rights.

*In re J.S.*, 374 N.C. 811, 815, 845 S.E.2d 66, 71 (2020) (emphasis in original) (citations, ellipses, and brackets omitted). We first note it is undisputed Rex was "left" in foster care "for more than a year at the time the petition to terminate parental rights [was] filed." *Id.* Father only contends the trial court erred in using Father's immigration status and operated under a misapprehension of law as to whether Father could take immediate custody of Rex and that the trial court improperly required him to complete all elements of his case plan.

Our Supreme Court has outlined how to evaluate whether a parent's lack of progress with their case plan was willful:

> [A] finding that a parent acted "willfully" for purposes of
> N.C.G.S. § 7B-1111(a)(2) does not require a showing of
> fault by the parent. A respondent's prolonged inability to
> improve her situation, despite some efforts in that
> direction, will support a finding of willfulness regardless of
> her good intentions, and will support a finding of lack of
> progress sufficient to warrant termination of parental
> rights under section 7B-1111(a)(2).

*Id.*

In addressing housing concerns, our Supreme Court specifically noted in a case where the mother moved from a motel to a house, but only a month before the termination hearing, "[t]his limited and delayed progress does not amount to reasonable progress in light of the fact that the children had been in YFS custody for over three years." *In re E.C.*, 375 N.C. 581, 587, 849 S.E.2d 806, 811 (2020) (citation omitted). Here, Father lived in a house with other unknown adults and slept on the couch in the living room; this situation was the same since at least November 2022 and the termination hearing was not until April 2024. Father agreed that this was an unsuitable arrangement for a child but could not secure adequate housing despite having over two years to do so. DSS provided information and assistance to Father in seeking housing and particularly trying to find housing that would be available to him despite his undocumented immigrant status and his criminal record. In addition, Father did not challenge finding 76, where the court found that "[Father] acknowledged in his testimony today that the primary obstacle he encountered in obtaining housing was his criminal record." We also note Father had sufficient

income to be able to pay for housing, as the trial court found that he worked full-time and had a surplus after paying his basic living expenses – including his rent and utilities – of $2,000.00 per month at the time of the hearing, so his inability to find housing was not based on poverty.

The trial court also noted, and Father was aware, he was not required to have housing with a formal lease agreement but he would need to give DSS the names of adults who would be living in the home with Father and Rex so they could conduct background checks on the individuals. Father refused to do this throughout the pendency of his case. And despite the ten to fifteen resources Father was given by DSS, the testimony at the hearing showed he only contacted two of those resources and acknowledged after he was denied housing at a facility due to his criminal record, he essentially stopped applying because he assumed he would be denied again. Father had ample time to find housing, was given resources by DSS but did not utilize the resources fully and took limited steps to obtain housing. Although Father made progress in other areas of his case plan, such as completing parenting classes, he failed to make progress in obtaining suitable housing. Just as in *In re E.C.*, where the respondent actually found housing shortly before the termination hearing, "[t]his limited and delayed progress does not amount to reasonable progress." *Id.*

As to his immigration status, Father also cites to *In re B.S.O.*, 234 N.C. App. 706, 760 S.E.2d 59 (2014), to illustrate the effect of deportation on a termination of parental rights case. In *In re B.S.O.*, this Court stated "a parent's deportation should

serve as neither a sword nor a shield in a termination of parental rights decision." 234 N.C. App. at 711, 760 S.E.2d at 64 (citations and quotation marks omitted). And while this principle is not in dispute, the trial court did not rely on, or even discuss, Father's immigration status in determining there were adequate grounds to terminate his parental rights. Father recognizes his case differs from *In re B.S.O.* since he was not actually deported or facing deportation, as far as we can tell from the record, but instead argues his immigration status prevented him from obtaining housing and it would thus be improper to terminate his parental rights based solely on his failure to secure safe and stable housing.

But we disagree with Father's contention that "his undocumented status prevented him from acquiring adequate housing for Rex." The trial court found that his "primary obstacle" in obtaining housing was "his criminal record." The trial court also found that he had "convictions for Assault of a Female, Assault with a Deadly Weapon, and Assault on a Child Under 12." Although Father's immigration status was a factor in his difficulty in finding housing, it was not his "primary obstacle"; that was his criminal record. Father's assertion the trial court improperly used his immigration status in terminating his parental rights is without merit.

Father also contends the trial court operated under a misapprehension of law since it "essentially found that [ ]Father was unable to have Rex in his care and custody at the time of the TPR hearing since finding 90 outlined what would happen if Father regained custody." Father cites to *In re J.S.*, 374 N.C. at 812, 845 S.E.2d at

73, to contend the trial court cannot consider whether a parent can regain custody of a child at the time of the termination hearing. Our Supreme Court, quoting *In re L.C.R.*, 226 N.C. App. 249, 252, 739 S.E.2d 596, 598 (2013), provides:

> the issue of whether or not the parent is in a position to actually regain custody of the children at the time of the termination hearing is not a relevant consideration under N.C.G.S. § 7B-1111(a)(2), since there is no requirement for the respondent-parent to regain custody to avoid termination under that ground. Instead, the court must only determine whether the respondent-parent had made reasonable progress under the circumstances in correcting those conditions which led to the removal of the juvenile. Accordingly, the conditions which led to removal are not required to be corrected completely to avoid termination. Only reasonable progress in correcting the conditions must be shown.

*In re J.S.*, 374 N.C. at 812, 845 S.E.2d at 73 (citation, quotation marks, and ellipses omitted). Although finding 90 is phrased as what would likely happen if "the court were to return custody of [Rex] today," this finding, in context, was directly addressing Father's failure to make reasonable progress to correct the exact circumstances that led to Rex's removal. Essentially, the trial court found that nothing had changed since Rex was removed; Father still did not have a safe place for Rex to live and had no prospects of finding a safe place; and he still had no identified person or facility to provide safe care for Rex while he was working. As outlined above, the trial court discussed Father's past and current living conditions, the more than two years Father had to correct these conditions, the efforts DSS made to assist Father in finding housing and Father's limited use of these resources, and

Father's financial situation which showed he was able to afford housing. This argument is overruled.

Finally, Father argues the trial court "operated under a misapprehension of law by believing that [ ]Father was supposed to have accomplished *all* the requirements of his case plan[.]" (Emphasis added.) Father is correct that "a trial judge should refrain from finding that a parent has failed to make reasonable progress in correcting those conditions which led to the removal of the juvenile simply because of his or her failure to fully satisfy all elements of the case plan goals." *In re A.B.C.*, 374 N.C. 752, 760, 844 S.E.2d 902, 909 (2020) (citations, quotation marks, and ellipses omitted). "However, we have also stated that a trial court has ample authority to determine that a parent's extremely limited progress in correcting the conditions leading to removal adequately supports a determination that a parent's parental rights in a particular child are subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2)." *Id.* And in *In re A.B.C.*, we upheld the trial court's determination that the respondent failed to make reasonable progress since the core issues resulting in the child's removal were substance abuse issues and the respondent only made limited progress in correcting that condition. *See id.* Here, Father did make more progress in the other areas of his case plan such as parenting classes and substance abuse, but he made essentially no progress in the housing issue. A core issue resulting in Rex's removal from his parent's care was housing; neither Father nor the mother had adequate housing for Rex. Thus, the trial court did not require Father

make reasonable progress in all elements of his case plan as he contends and Father's limited progress in addressing housing is a proper basis for the trial court to terminate his parental rights under North Carolina General Statute Section 7B-1111(a)(2).

The trial court relied on Father's inability to provide safe and stable housing to Rex as a basis for terminating his parental rights, not his immigration status. In addition, Father still was unable to provide a suitable housing arrangement for Rex and this did not change in over two years since Rex was removed from his mother's care. Therefore, Father failed to make reasonable progress with his case plan and the trial court did not err in terminating his parental rights under North Carolina General Statute Section 7B-1111(a)(2). We need not review the trial court's conclusion as to North Carolina General Statute Section 7B-1111(a)(1) for neglect. *See In re D.H.H.*, 208 N.C. App. 549, 552, 703 S.E.2d 803, 805-06 (2010) ("Although the trial court found that three grounds existed, a single ground is sufficient to support an order terminating parental rights. Therefore, if we determine that the findings of fact support one of the grounds, we need not review the other grounds." (citations, quotation marks, ellipses, and brackets omitted)).

## III.   Conclusion

As the challenged findings of fact are supported by the evidence and the findings support the conclusion that Father failed to make reasonable progress with his case plan under North Carolina General Statute Section 7B-1111(a)(2), we affirm

the trial court's termination Order.

AFFIRMED.

Judges ZACHARY and COLLINS concur.