An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-475

Filed 3 December 2025

Moore County, Nos. 21JT000025-620, 21JT000026-620, 21JT000027-620

In the matter of: Z.R.B., M.B., M.B., Jr.

Appeal by Respondent-mother from orders entered 27 December 2024 by Judge Warren McSweeney in Moore County District Court. Heard in the Court of Appeals 30 October 2025.

*Administrative Office of the Courts, by GAL Staff Attorney Brittany T. McKinney, for the Guardian ad Litem; and Sharlene Gilmer Anderson for Moore County Department of Social Services.*

*BJK Legal, by Benjamin J. Kull, for respondent-appellant mother.*

WOOD, Judge.

Respondent-Mother ("Mother") appeals from the trial court's orders terminating her parental rights to her minor children: Z.R.B. ("Zachary"), M.B.

("Michelle"), and M.B., Jr. ("Marcus").[1]  Mother argues the trial court erred by (1) violating N.C. Gen. Stat. § 7B-906.2(b) during the reunification process thereby necessitating the termination order be vacated; (2) allowing the children to testify in chambers without notifying the parties on the record; and (3) acting beyond the scope of its statutory authority by declaring that Marcus' consent, a teen-aged minor, would be irrelevant in any future adoption proceeding.

After careful review of the record, we agree the trial court erred by violating N.C. Gen. Stat. § 7B-906.2(b) during the reunification process by ceasing reunification efforts while maintaining reunification as a permanent plan for an extended period of time.  Therefore, we reverse the trial court's orders and remand for further proceedings.

## I.  Factual and Procedural Background

On 11 March 2021, Moore County Department of Social Services ("DSS") received a report containing allegations that Mother and her boyfriend were constantly drunk around the children, the children were not properly fed or bathed, and the children were not going to school.  Further reports against Mother alleged that she had slapped Zachary "on the face hard enough that she [injured] him and caused bleeding." Another report alleged that she gave the children her prescription

---

[1] Pseudonyms are used to protect the identity of the juveniles pursuant to N.C. R. App. P. 42(b).

medication, Seroquel, causing them "to sleep all day." The report also contained general allegations of domestic violence in the presence of the children and improper discipline.

On 15 March 2021, the children were tested for the presence of illegal substances. Marcus' hair follicle screening yielded a positive result for crack cocaine and indicated the presence of hydroxydopamine metabolites, consistent with the ingestion of cocaine. On 22 March 2021, Mother's hair follicle screening tested positive for cocaine, marijuana, cocaethylene, benzoylecgonine, norcocaine, and CarboxyTHC.

On 24 March 2021, DSS filed petitions alleging that Michelle and Zachary were neglected and dependent juveniles and that Marcus was a neglected, dependent, and abused juvenile. That same day, DSS obtained non-secure custody of all three children. DSS specifically alleged in the petition that Marcus was an abused juvenile because "his parent, guardian, custodian, or caretaker, created or allowed to be created a substantial risk of serious physical injury to [Marcus] by other than accidental means," in part due to his positive hair follicle screening.

On 26 April 2021, Mother entered into a case plan with DSS, whereby she agreed to "complete a comprehensive clinical assessment to address substance abuse and domestic violence, participate in a psychological evaluation, [take] parenting classes, [submit to] random drug screens (hair and oral), obtain stable income and continue to have stable housing."

On 3 June 2021, the trial court held an adjudication and disposition hearing pursuant to N.C. Gen. Stat. §§ 7B-801 and 7B-901. In its 6 July 2021 order following the hearing, the trial court concluded that Michelle and Zachary were neglected juveniles and that Marcus was a neglected and abused juvenile. The trial court made findings as to Mother's and Marcus' positive hair follicle screenings, noting Michelle's hair drug screen came back twice as contaminated and unsuitable because "the presence of illegal substances [were] coating the hair to such a degree that the laboratory was unable to clear the sample and take any reliable measurements."

The trial court also found that Mother: had entered into a case plan with DSS on 26 April 2021; completed a comprehensive clinical assessment and received recommendations to engage in therapy; took both an oral and hair drug screen on 13 May 2021 and was negative for all substances; was employed and had been employed since April 2021; was actively and appropriately engaged in visitation with the children and no concerns were noted; and was diagnosed with cannabis disorder, mild/unspecified bipolar, and related disorder and was in treatment.

At disposition, the trial court continued the juveniles in the custody of DSS and ordered Mother to comply with all recommendations from the comprehensive clinical assessment and her case plan. The trial court awarded Mother with up to four hours of supervised visitation per week, requiring that visitation be scheduled and supervised by DSS and approved by certain parties.

On 15 September 2021, Mother began the assessments for her "Parental Competency/Psychological Evaluation." Assessments continued for nine sessions, lasting until 18 January 2021 when an assessment report was completed. The report indicated Mother had a full-scale IQ of 71, in the "borderline" range. The report stated Mother is "not viewed as capable of parenting her children independently due to her history of serious neglect, a severe mental illness, and cognitive limitations."

On 18 November 2021, the trial court held its first permanency planning hearing. In its 8 December 2021 order following that hearing, the trial court found that Mother was doing "very well" on her case plan. Specifically, Mother was maintaining housing, working at a grocery store where she was to receive a promotion and a raise, testing negative on her drug screens, and complying with the recommendations of her assessment. However, the trial court noted that Mother had been recently charged with driving while intoxicated and other related charges, for which she faced possible incarceration. The trial court noted DSS's concerns as to these charges; continued concern regarding Mother's involvement with her boyfriend—who was previously convicted of murder and had repeated domestic violence incidents with Mother; and 911 reports that demonstrated several "domestic calls" and a "psychiatric/suicide call" at Mother's residence. Nevertheless, it is undisputed Mother was making progress on her case plan. The trial court ordered reunification to be the primary plan with guardianship with a relative as the secondary plan.

On 24 February 2022, the trial court held a second permanency planning hearing. In its 24 March 2022 order following that hearing, the trial court found that, while Mother was "doing very well on her case plan," Mother had admitted to a "slip" in her sobriety over the holidays. The trial court also found that the parental capacity assessment was conducted and Mother had already identified and put a "support person" in place as recommended and that "[DSS] remain[ed] cautious but hopeful as to reunification with [Mother] and would like to go slow with efforts due to continued concerns" with Mother's sobriety, mental health issues and treatment, and criminal charges resulting from her DWI. The trial court then ordered unsupervised visits with Mother and the children and ordered that the primary plan continue to be reunification with Mother, with guardianship with a relative or appropriate person as the secondary plan.

On 12 May 2022, the trial court held a third permanency planning hearing. In its 13 June 2022 order following that hearing, the trial court found that Mother had admitted to another relapse in her sobriety in February 2022; declined to go to a recommended 120-day inpatient program for treatment stating her "inability to maintain her employment and housing" but engaged in a Substance Abuse Intensive Outpatient Program three times a week for three hours; was unable to arrange for transportation needs for the unsupervised visit with Zachary but did have positive unsupervised visits with Michelle and Marcus; and her original support person would be less available however she identified another support person through work. The

trial court further found that there were "concerns with [Mother's] ability to understand the needs of her children and her own needs," but DSS "remains cautious but hopeful as to reunification with [Mother]." However, even after stating that they remained hopeful and only four months after the completion of the parenting assessment which found Mother needs support with parenting skills, DSS recommended "[t]hat reasonable efforts towards any plan for Reunification per N.C. [Gen. Stat.] § 7B-906.2(b) be ceased at this time with [Mother] . . . [as] [r]eunification would be inappropriate and not likely [ ] successful." The conflict regarding the assessment and recommendation was not explained. The trial court accepted DSS' recommendation and ceased reunification efforts with Mother without explanation. However, the trial court continued unsupervised visitation with Mother and continued a secondary plan of reunification with "guardianship with a concurrent plan of adoption with a relative or appropriate person(s)" as the primary plan. Mother did not appeal this order.

On 16 June 2022, the trial court held a fourth permanency planning hearing. In its 18 July 2022 order following that hearing, the trial court found that Mother's criminal matters had been resolved and that she had been placed on community service and would not serve active time as long as she complied with the conditions of her probation. The trial court further found that Mother is "doing well with her services and is appropriate during her visitation." It further found she had continued unsupervised visitation and had maintained housing and employment. However, the

trial court ordered that DSS reunification efforts with Mother would remain ceased, "to allow [Mother] to show ability and independence in working her case plan, arranging unsupervised visitation, complying with her probation, and effectively utilizing her support persons." The trial court then continued guardianship as the primary plan and reunification with Mother as the secondary plan.

On 2 March 2023, the trial court held a fifth permanency planning hearing. In its 5 April 2023 order following that hearing, the trial court found that Mother still continued to see her boyfriend; had relapsed since the last hearing; and had been visibly intoxicated on 6 June 2022 when Marcus was present for an unsupervised visit and had subsequently lost unsupervised visitation. Mother subsequently entered a 3-day detox program at First Health, then completed a continuation program at Old Vineyard Treatment center from 7 July until 15 July 2022. On 28 July 2022, she entered a 30-day recovery program at Anuvia Prevention and Recovery Services which she completed successfully on 26 August 2022. She had been awaiting a bed at Hope Haven, a therapeutic recovery home, but then had elected to restart outpatient classes with Daymark and was doing well. She had completed the intake paperwork for mental health support with Bradford and Associates, but she had not begun sessions as her schedule had been full of medical appointments resulting from her recent breast cancer diagnosis. Mother voluntarily left her previous employment to enter rehab but was now employed with First Health. However, she had not yet identified a new support person at the new job. The trial court ordered that DSS

reunification efforts with Mother remain ceased and continued guardianship as the primary plan with a secondary plan of reunification with Mother.

On 26 October 2023, the trial court held a sixth permanency planning hearing. In its 21 November 2023 order following that hearing, the trial court found that Mother's first unsupervised visit with Zachary was disrupted due to her "being publicly intoxicated while she had him in her care," although no date was given and it is unclear as to when unsupervised visitation had resumed. She had told DSS that she was going into treatment but denied DSS access to any of her records. DSS obtained her records through subpoena. DSS expressed concern that the records reflect that she had denied history for alcohol use "despite having a diagnosis of severe alcohol use disorder;" that "concerns remain regarding her ability to independently parent all three high needs children without extensive support;" she had listed her boyfriend as her primary contact person in her medical records despite their history of domestic violence and him having an extensive past criminal history including manslaughter involving a child; and that she stopped engaging with DSS and refused to provide updates about her health and case plan progress although DSS was aware Mother was in treatment for breast cancer and will be undergoing a mastectomy. The trial court then ordered that reunification efforts with Mother remain ceased and ordered that guardianship be the primary plan with adoption as the secondary plan.

On 2 February 2024, DSS filed motions for termination of Mother's parental rights. In the motions, DSS stated there existed "clear and convincing facts sufficient to terminate" Mother's parental rights under section 7B-1111(a)(1), (a)(2), and (a)(6). Specifically, DSS alleged that Mother had neglected the children within the meaning of subsection 7B-1111(a)(1); that Mother failed to make reasonable progress within the meaning of subsection 7B-1111(a)(2); and that the children were dependent within the meaning of subsection 7B-1111(a)(6). On 4 April 2024, the trial court appointed a Rule 17 guardian *ad litem* for Mother due to her cognitive limitations based on the previous assessments which indicated she "is limited in her ability to appreciate and understand the nature of the proceedings and her involvement with the children in this matter."

On 18 July 2024, the trial court held an adjudication hearing to terminate parental rights. At the hearing, the trial court received testimony from DSS social worker, Charles Craven, and Mother's "offered support person", Cynthia Stringfield. The trial court admitted and incorporated into the record exhibits, including in part, a timeline of Mother's compliance, Mother's psychological evaluation, Mother's medical records, and comprehensive clinical assessments of the children. The trial court found that grounds existed to terminate Mother's parental rights. Specifically, the trial court concluded that Mother had neglected the children and there was a likelihood of future neglect under section 7B-1111(a)(1); "willfully left the children in foster care without showing to the satisfaction of [the trial court] reasonable progress

under the circumstances" under section 7B-1111(a)(2); and that she was incapable of providing for the proper care and supervision of the children, and there existed "a reasonable probability that such incapacity would continue for the foreseeable future," under section 7B-1111(a)(6).

On 12 September 2024 and 7 November 2024, the trial court held the disposition hearing. The trial court received testimony from DSS social worker, Ze'Tonya McMillan; the prospective adoptive parents of the children; GAL Supervisor April Ferrell; and Mother. At the hearing on 12 September 2024, the following exchange occurred:

> The Court: [I] think there was some talk at the last hearing about me meeting with the children prior to the hearing today. And the Court, just for the record, just put it on the record – the Court did meet in chambers with [Marcus and Michelle], with Ms. April Ferrell on behalf of GAL that was present in conference. We did that for about 15, 20, 30 minutes or so.
>
> And as I instructed them, and as I instruct everybody here, as I always do anytime that I speak with children, whether it's in a Chapter 50 custody action or in this – these type of proceedings, I want everybody on notice that if I catch wind of anybody asking the kids – I don't care who it is, whether it's an attorney, foster parent, whoever it is, friend relative . . . if I find out that there is some conversations about, "[w]hat did you tell the Judge?" Or "[w]hat did the Judge say?" I will guarantee you that you're going to jail. I told those kids, "[w]hatever you tell me is to be held in confidence." It will go towards me making a decision on what to do as far as what is in their best interests.
>
> But unfortunately, in Chapter 50 proceedings – and the reason I make that bold of a statement, saying that you will

go to jail – I have locked up people for doing that in a custody case where I found out somebody talked to the child. And I've got zero tolerance for that.

There were no objections at trial regarding the testimony of the children in chambers without attorneys present. The trial court concluded it was in the children's bests interests to terminate Mother's parental rights and ordered that Mother's parental rights be terminated. At issue on appeal, the trial court found in its 27 December 2024 order that:

> it is in [Marcus'] best interest that he be adopted whether or not he, at the age of 13, himself consents to the adoption. The [trial court] believes that Marcus may be unable to fully appreciate his own limitations and needs and that of his biological mother. Therefore, the adoption should proceed with or without the juvenile's specific consent in accordance with N.C.G.S. 48-3-601.

Mother timely appealed each 27 December 2024 order terminating her parental rights to Zachary, Michelle, and Marcus. (T p 597, 610, 625). Mother also filed a petition on 16 June 2025 for a writ of *certiorari* in the event this Court does not find jurisdiction to review all the issues she raises on appeal.

## II. Analysis

This Court has jurisdiction to review "[a]ny order that terminates parental rights or denies a petition or motion to terminate parental rights." N.C. Gen. Stat. § 7B-1001(a)(7) (2023). In conducting our thorough review, we consider the underlying circumstances and proceedings leading up to the filing of the termination of parental

rights petitions. Therefore, a writ of *certiorari* is not necessary. We dismiss Mother's petition for writ of *certiorari* as moot.

On appeal Mother argues the trial court erred by: (1) violating N.C. Gen. Stat. § 7B-906.2(b) during the reunification process thereby necessitating that the termination order be vacated; (2) allowing the children to testify in chambers without notifying the parties on the record; and, (3) acting beyond the scope of its statutory authority by declaring that Marcus' consent would be irrelevant in any future adoption proceeding.

**A. N.C. Gen. Stat. § 7B-906.2(b)**

"When an appellant argues the trial court failed to follow a statutory mandate, the error is preserved, and the issue is a question of law and reviewed de novo." *In re S.D.H.*, 296 N.C. App. 392, 399, 908 S.E.2d 868, 876 (2024) (quotation omitted). Our Supreme Court has clarified "there [is] a statutory mandate that automatically preserve[s] an issue for appellate review when the mandate [is] directed to the trial court either: (1) by requiring a specific act by the trial judge, or (2) by requiring specific courtroom proceedings that the trial judge has authority to direct[.]" *In re E.D.*, 372 N.C. 111, 119, 827 S.E.2d 450, 455–56 (2019) (internal citation omitted). Mother asserts the trial court failed to follow N.C. Gen. Stat. § 7B-906.2(b) during the reunification process. We agree.

N.C. Gen. Stat. § 7B-906.2(b) states, in pertinent part, "[u]nless permanence has been achieved, the court *shall order* the county department of social services to

make efforts toward finalizing the primary and secondary permanent plans and may specify efforts that are reasonable to timely achieve permanence for the juvenile." N.C. Gen. Stat. § 7B-906.2 (2023) (emphasis added). "This Court has held that use of the language 'shall' is a mandate to trial judges, and that failure to comply with the statutory mandate is reversible error." *In re Watson*, 209 N.C. App. 507, 513, 706 S.E.2d 296, 300 (2011) (quoting *In re Eades*, 142 N.C. App. 712, 713, 547 S.E.2d 146, 147 (2011)). Clearly N.C. Gen. Stat. § 7B-906.2(b) specifically requires the trial judge to order DSS to provide reasonable services. This meets the Supreme Courts test for a statutory mandate requiring a specific act by a trial judge. *In re E.D.*, 372 N.C. at 119, 827 S.E.2d at 455–56.

The mandatory requirement for the trial court to order reunification efforts is consistent with the legislative purpose behind the Abuse, Neglect, Dependency subchapter of our Juvenile Code and is supported by our Courts' reading of those statutes.

The purpose of the Subchapter on Abuse, Neglect, Dependency reads, in pertinent part,

> "This Subchapter *shall be interpreted and construed* so as to implement the following purposes and policies:
>
> (1) To provide procedures for the hearing of juvenile cases that assure fairness and equity and that *protect the constitutional rights of juveniles and parents*;
> . . .
> (4) To provide standards for removal, when necessary, of juveniles from their homes and for *the return of juveniles to*

*their homes* consistent with preventing the unnecessary or inappropriate separation of juveniles from their parents.

N.C. Gen. Stat. § 7B-100 (2023) (emphasis added). Additionally, the statutes lay out that reasonable efforts by DSS include, "[t]he diligent use of preventive or reunification services by a department of social services when a juvenile's remaining at home or returning home is consistent with achieving a safe, permanent home for the juvenile within a reasonable period of time." N.C. Gen. Stat. § 7B-101(18) (2023). Clearly, when the trial court determines that reunification is part of the permanent plan, the statute imposes a duty on the court to ensure DSS employs diligent services to aid in reunification. As our Courts have stated, "[u]nder our statutes, reunification whenever possible is the goal of juvenile court." *In re S.D.*, 276 N.C. App. 309, 323, 857 S.E.2d 332, 343 (2021) (cleaned up). The stated purposes of "fairness and equity" and prevention of unnecessary separation cannot be achieved when the trial court fails to follow statute and prematurely and in error excuses DSS from providing a family the reasonable efforts to support the family in achieving their court ordered plans. It is prejudicial when a parent's ability to make progress towards reunification, the yard stick by which the trial court considers grounds for termination of parental rights, is undermined by the wrongful elimination of reunification efforts. *See* N.C. Gen. Stat. § 7B-1111 (2023). Our General Assembly clearly considered the importance of reunification efforts in N.C. Gen. Stat. § 7B-1001(a2) when it determined that if reunification efforts were improperly eliminated

then the termination order could not stand. N.C. Gen. Stat. § 7B-1001(a2) (2023). Although the issue *sub judice* presents during review of the termination order rather than the more traditional appeal of the order eliminating reunification as the permanent plan, a review of the findings in the termination order reveals that the trial court's failure to follow a critical statutory mandate clearly prejudiced Mother.

For example, the following findings demonstrate the trial court's failure to comply with the statutory mandate in N.C. Gen. Stat. § 7B-906.2:

> 30. That the Court takes judicial notice of all prior orders entered in the pending juvenile proceeding and notes that the orders were continuing in nature.
>
> . . .
>
> 38. . . . That on May 12, 2022 this court ceased reasonable efforts toward reunification with the respondent mother. The court changed the permanent plan for the juvenile to a concurrent primary permanent plan of adoption and guardianship with a secondary plan of reunification with the respondent mother. On June 16, 2022 the plan again changed to a primary plan of guardianship with a secondary plan of reunification and efforts toward reunification with the parents remained ceased. On October 26, 2023 the Court changed the primary permanent plan to guardianship with a secondary plan of adoption.

Finding of fact 31 clearly demonstrates reunification efforts for Mother were ceased on 12 May 2022 while reunification as a permanent plan was not removed until 26 October 2023, nearly eighteen months later. Irrespective of the strength or weakness of the additional findings in the termination order, we cannot now

determine whether Mother made adequate progress or could have had the ability to improve conditions that led to removal because the trial court erroneously allowed DSS to remove all support from Mother for well over half the time her case plan was in place, despite its acknowledgment of Mother's assessment determining she has a full-scale IQ of 71 and needed support with her parenting skills. Additionally, the trial court summarized its determination of Mother's progress finding, Mother "has not proven over the course of the proceedings that she has the capability to overcome the reunification barriers present due to her mental health, physical health, and cognitive limitations." However, the court's references to "mental health" and "physical health" are not thereafter explained with any further detail anywhere within the termination orders, and although cognitive limitations were noted early in the proceedings, a Guardian *ad litem* was not appointed until 4 April 2024, well after reunification had been removed as a permanent plan and DSS had filed for termination of parental rights. Consequently, Mother did not receive any support from DSS or a Guardian *ad litem* for the majority of the life of this case and during which time she was actively engaged in reunification efforts. DSS made reasonable efforts towards reunification for only fourteen of the forty-five months of the life of this case. This falls far short of "assur[ing] fairness and equity and [protecting] the constitutional rights of juveniles and parents" as contemplated and mandated by our General Assembly. N.C. Gen. Stat. § 7B-100 (2023).

DSS argues our Supreme Court has already determined a trial court may cease reunification efforts without eliminating reunification as a permanent plan based on its ruling in *In re C.H.*, 381 N.C. 745, 754, 874 S.E.2d 537, 545 (2022). However, this argument is inapposite. In *In re C.H.* the respondent-father demonstrated "volatile and hostile behavior" towards DSS staff during visitation, in person, and *via* phone calls. *Id.* at 747, 874 S.E.2d at 541. DSS was forced to suspend visitation with the children due to his combative behavior and purported insistence on using corporal punishment during visitation. He used vulgar and threatening language with multiple DSS staff members and responded to DSS attempts to assist him with "opposition, combativeness, and verbal aggression." *Id.* at 752, 874 S.E.2d at 544.

Our Supreme Court held that "[b]ased on this behavior the trial court did not err in determining that it was reasonable for DSS to cease efforts toward reunification with respondent. *Id.* at 754, 874 S.E.2d at 545. The Court also noted "at that time [the trial court] could also have eliminated reunification as a permanent plan but chose instead to provide respondent additional time to demonstrate his ability to make progress on his case plan" and when he failed to make progress, reunification was removed from the plan in less than two months. *Id.*

In contrast, Mother never displayed vulgar or aggressive behavior toward DSS, and her visitation was going "very well." In the order terminating reunification efforts, the trial court found DSS "remains cautious but hopeful as to reunification with [Mother]." However, even after stating that it remained hopeful of reunification

and only four months after the completion of the parenting assessment requested by DSS which found Mother needs support with parenting skills, DSS inexplicably recommended "[t]hat reasonable efforts towards any plan for Reunification per N.C. [Gen. Stat.] § 7B-906.2(b) be ceased at this time with [Mother] . . . [as] [r]eunification would be inappropriate and not likely [ ] successful." The trial court then ceased reunification efforts with Mother without explanation. Furthermore, the trial court continued unsupervised visitation with Mother and had no concern for the safety of the children or DSS personnel. These conditions continued for 526 days, during which time it appears Mother was expected to make progress without any assistance or reasonable efforts from DSS. The facts of this case are distinguishable from the exceptional case presented in *In re C.H.* where our Supreme Court reasoned that the serious safety concerns for both DSS staff and the children warranted the suspension of visitation as well as reunification efforts. There, the trial court had the findings necessary to remove reunification as a permanent plan at that time but allowed respondent-father a small amount of extra time to demonstrate improvement before completely removing reunification. In stark contrast, the trial court here acted in direct, explicit, and erroneous contravention of the statutory mandate in N.C. Gen. Stat. § 7B-906.2, and in doing so, completely undermined the legislative purpose of our Abuse, Neglect, Dependency statutes. This violation of the statutory mandate deprived Mother of the opportunity to continue to make the necessary progress towards reunification. Because the trial court failed to follow the statutory mandate

in N.C. Gen. Stat. § 7B-906.2(b), the termination of parental rights orders are vacated and these matters are remanded to the trial court for further proceedings. Because we vacate the termination orders, we need not address Mother's additional arguments.

## III. Conclusion

For the foregoing reasons, we hold the trial court violated the statutory mandate in N.C. Gen. Stat. § 7B-906.2(b) for reunification efforts and Mother was prejudiced thereby. The termination of parental rights orders are vacated and this cause is remanded to the trial court for further proceedings. It is so ordered.

VACATED AND REMANDED.

Judge TYSON concurs.

Judge FREEMAN dissents by separate opinion.

Report per Rule 30(e).

No. COA25-475 – *In re: Z.R.B., M.B., M.B., Jr.*

FREEMAN, Judge, dissenting.

I respectfully dissent from the majority's holding reversing and remanding the trial court's orders. Because respondent-mother cannot show extraordinary circumstances in her petition for writ of certiorari, and prejudice on the merits if we were to grant the writ, I would deny respondent-mother's petition and affirm the trial court's 27 December 2024 order. I would also affirm the order of the trial court on respondent-mother's third issue relating to consent for adoption.

## I.    Petition for Writ of Certiorari

Here, respondent-mother asks this Court to review seven past permanency planning orders that were not previously appealed through a petition for writ of certiorari. Respondent-mother argues in her petition for writ of certiorari that the trial court erred by including reunification in the permanency plan while eliminating reunification efforts in previous permanency planning orders. Respondent-mother further petitions this court to review in chambers testimony of Marcus and Michelle without the presence of counsel.

"The writ of certiorari is one of the 'prerogative' writs that the Court of Appeals may issue in aid of its own jurisdiction." *Cryan v. Nat'l Council of Young Men's Christian Ass'ns of U.S.*, 384 N.C. 569, 572 (2023) (citing N.C.G.S. § 7A-32(c) (2021)). "When contemplating whether to issue a writ of certiorari, our state's appellate courts

must consider a two-factor test. That test examines (1) the likelihood that the case has merit or that error was committed below and (2) whether there are extraordinary circumstances that justify issuing the writ." *Id.* at 570. The first step "weighs the likelihood that there was some error of law in the case." *Id.* at 572. The second step requires "extraordinary circumstances" to justify the issuing of the writ. *Id.* Extraordinary circumstances are required "because a writ of certiorari is not intended as a substitute for a notice of appeal." *Id.* at 573 (cleaned up). While there is no "fixed list" of extraordinary circumstances, this factor "generally requires a showing of substantial harm, considerable waste of judicial resources, or 'wide-reaching issues of justice and liberty at stake.' " *Id.* (citation omitted). The ultimate decision on whether or not to issue the writ of certiorari "rests in the sound discretion of the presiding court." *Id.*

First, a writ of certiorari is required in the present case and without it, this Court does not have jurisdiction to review the past permanency planning orders. *See generally In re K.R.*, No. COA25-105, 920 S.E.2d 556, 2025 WL 2924808 (2025) (denying the respondent's petition for writ of certiorari to review a permanency planning order because the respondent failed to dispute the order for over a year, and concluding that the delay was unreasonable). The present appeal is from a disposition order terminating respondent-mother's parental rights, entered 27 December 2024. Because plaintiff did not timely appeal any of the seven permanency planning orders, the writ of certiorari is needed for this court to have jurisdiction and

to review those issues on appeal. Recognizing this, plaintiff submitted a petition for writ of certiorari requesting this Court to review seven permanency planning orders that date back to 2022. Therefore, issuing the writ of certiorari is necessary for our review of the permanency planning orders and the only order jurisdictionally and properly before us on appeal is the order terminating parental rights entered on 27 December 2024. Thus, the majority errs by concluding that issuing the writ of certiorari is not necessary to review these issues.

Second, I would deny respondent-mothers petition for writ of certiorari. Respondent-mother fails to show extraordinary circumstances to justify issuance of the writ. *See Cryan*, 384 N.C. at 573. Respondent-mother contends our General Statutes, Chapter 7B's goal of "reunifying families"; "the tradition in our country of respecting and safeguarding family integrity"; and the fact that although respondent-mother has limitations, she "has consistently made efforts to improve her circumstances" and that "she is a well-intentioned parent who was making the effort" amount to extraordinary circumstances to grant the writ. These are not extraordinary circumstances. Further, the orders in question could have been properly appealed in their own right had respondent-mother appealed at the appropriate juncture, but she failed to dispute these permanency planning orders for almost three years. Accordingly, in my discretion, I would deny respondent-mother's petition for writ of certiorari on this issue.

Respondent-mother also asks this court to issue its writ of certiorari to review

3

certain testimony by two of the children, in-chambers and without the presence of attorneys. On this issue, respondent-mother contends that the trial court was "proactively gathering its own evidence in secret, and then relying on that evidence without sharing it with the parties." Counsel failed to object to this testimony during the hearing. Respondent-mother asserts that the reason there was no objection was because:

> the court's threat to jail anyone who dared ask the children about the private proceeding, along with the court's concurrent comment that it had done such a thing before, inevitably cast a chill that would have given great pause to any attorney who, in that moment, may have otherwise been inclined to openly question the court's action.

Respondent-mother does not show extraordinary circumstances to justify issuing the writ—beyond the failure to object to the testimony because of the "[trial] court's threat to jail" and the "chill" that was cast over the courtroom. Upon review of the transcript, it appears that the hearing continued as normal after this exchange with no "great pause." Accordingly, I would deny respondent-mother's petition for writ of certiorari on this issue.[2]

## II. Reunification Efforts

---

[2] If I were to reach the merits of this argument, I would conclude that respondent-mother does not argue prejudicial error, and would accordingly hold that the trial court did not prejudicially err. *See In re C.H.*, 381 N.C. 745, 754 (2022) (stating that "[t]o obtain relief on appeal, an appellant must not only show error, but that . . . the error was material and prejudicial, amounting to denial of a substantial right that will likely affect the outcome of an action." (quoting *In re B.S.O.*, 234 N.C. App. 706, 713 (2014)) (omission in original)).

IN RE: Z.R.B., M.B., M.B., JR.

*FREEMAN, J., dissenting*

If the petition for writ of certiorari was granted, I would nevertheless affirm the permanency planning orders of the trial court.

Here, the majority's opinion concludes "the trial court's failure to follow a critical statutory mandate clearly prejudiced [respondent-mother]"; however, respondent-mother only uses *hypotheticals*, if argued at all, in her argument for prejudicial error. *See In re C.H.*, 381 N.C. 745, 753 (2022) (concluding that "respondent has not argued that his lack of progress . . . was due to DSS's failure to provide further reunification efforts," and denying relief, in part, on that basis.).[3]  In her brief, respondent-mother states that "given the central relevance of [respondent-mother's] cognitive limitations and their resulting impact on her ability to understand her children's needs, the question would be *hypothetically speaking*, just how much further [respondent-mother's] understanding could have progressed *if* reunification efforts [had not been eliminated]." (emphasis added).  "To obtain relief on appeal, an appellant must not only show error, but that . . . the error was material and prejudicial, amounting to denial of a substantial right that will likely affect the outcome of an action." *In re C.H.*, 381 N.C. 745, 754 (2022) (quoting *In re B.S.O.*, 234 N.C. App. 706, 713 (2014)) (omission in original).

---

[3] In their joint brief, appellees rely on *In re C.H.*, 381 N.C. 745 (2022) and contend that the present case is analogous.  Because I would conclude that respondent-mother has not shown prejudicial error, I do not reach that argument.

Respondent-mother does not show the alleged error likely affected the outcome of this action. Even after ceasing reunification efforts, the trial court gave respondent-mother opportunities "to show ability and independence in working her case plan, arrang[e] unsupervised visitation, comply[ ] with her probation, and effectively utilize[e] her support persons" and respondent-mother showed she was unable to comply.

It is undisputed after reunification efforts were ceased, among other things, respondent-mother: (1) maintained involvement with her boyfriend, who was named in the original DSS petition, was previously convicted of manslaughter involving a child, and is not the children's biological father; (2) had several relapses in sobriety, which were difficult to detect because alcohol is her drug of choice; (3) failed to schedule *any* mental health appointments; (4) had her first unsupervised visit with Zachary disrupted because she was publicly intoxicated while he was in her care; (5) listed her boyfriend as her primary contact months after being cautioned to cease contact; (6) denied any history of alcohol "despite having a diagnosis of severe alcohol use disorder"; and (7) stopped engaging with DSS and refused to provide updates about her health and case plan progress.

Finally, at the seventh and final permanency planning hearing, the trial court found respondent-mother made no attempts to understand or even take part in the children's educational progress and still continued to see her boyfriend. Respondent-mother does not contend the above failures are a result of the ceasing of reunification

efforts. Based on the foregoing, among other things, I would conclude that respondent-mother has not shown prejudicial error.

### III. Consent to Adoption

Because I would not dispose of this case on the first issue, I would reach the merits of respondent-mother's third argument. Respondent-mother asserts the trial court "acted beyond the scope of its statutory authority by proactively declaring that Marcus' consent would be irrelevant in any future adoption proceeding." Specifically, respondent-mother argues "[t]he only dispute is whether to needlessly risk causing confusion at that hypothetical future adoption proceeding by letting [the] consent determination remain in the termination order." Respondent-mother concedes that "there is no actual disagreement as to this issue." Respondent-mother further states she hopes "that, at that hypothetical future adoption proceeding, the adoption court will realize that it must treat that unlawful consent determination as a legal nullity and therefore ignore it completely." Finally, respondent-mother "has not argued that this legal nullity warrants full reversal," instead respondent-mother solely requests that this finding "be stricken from the order in which it appears, if that order is otherwise affirmed."

After an adjudication by the trial court that one or more grounds exist to terminate the parent's rights, *see* N.C.G.S. § 7B-1111(a) (2023), the trial court progresses to the dispositional stage when terminating parental rights, *see id.* § 7B-1110(a) (2023). At the dispositional stage, the trial court, must "determine

whether terminating the parent's rights is in the juvenile's best interest." *Id.* § 7B-1110(a).

> In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

*Id.* In other words, the trial court is required to "consider all of the factors and make written findings regarding those that are relevant." *In re Z.A.M.*, 374 N.C. 88, 99 (2020).

Further, "[o]ur adoption statutes require the child's consent to an adoption if [the child] is at least twelve years of age." *In re B.E.*, 375 N.C. 730, 745 (2020) (citing N.C.G.S. § 48-3-601(1) (2019)). "Under N.C.G.S. § 48-3-603(b)(2) (2019), however, the trial court is authorized to 'issue an order dispensing with the [child's] consent . . . upon a finding that it is not in the best interest of the [child] to require the consent.' " *Id.* (omission and alterations in original).

In *In re B.E.*, our Supreme Court addressed a similar scenario involving the trial court's determination of a child over the age of twelve's consent to adoption in the trial court's termination order. Three children—Justin, Billy, and Chaz—had been adjudicated neglected and dependent. *Id.* at 732–33. The trial court held a dispositional hearing and concluded that terminating respondents' parental rights were in the best interests of Justin and Billy but not in the best interests of Chaz. *Id.* at 734. The respondent-father did not challenge the trial court's adjudication to terminate his parental rights; rather, the respondent-father argued on appeal that "the trial court abused its discretion at the dispositional stage of the proceeding by concluding it was in Billy's bests interests to terminate [his] parental rights, thereby ignoring Billy's expressed wishes not to be adopted." *Id.* at 744 (cleaned up).

The trial court found that Billy, fifteen-years-old at the time of the dispositional hearing, did not consent to the adoption, but found that "[b]ased on the evidence and testimony heard throughout the case, pursuant to [N.C.G.S. §] 48-3-603(b)(2), it [was] not in [Billy's] best interest for his consent to be required for adoption." *Id.* at 746. Our Supreme Court held that "by finding that it was not in Billy's best interests to require his consent to adoption, and by citing the applicable adoption statute, N.C.G.S. § 48-3-603(b)(2), the [trial] court demonstrated its consideration of Billy's stated preference for guardianship in lieu of adoption." *Id.* at 749. The Supreme Court clarified that "[a]lthough respondent-father does not challenge the trial court's finding on [the consent basis], we note the finding was not

9

made in the context of a pending adoption proceeding under Chapter 48 *and is not binding in any future action* for Billy's adoption." *Id.* at 749 n.10 (emphasis added).

I would reach the same conclusion. Like *In re B.E.*, Marcus was over the age of twelve at the time of the filing of the termination order; the trial court found the adoption should proceed, with or without Marcus' specific consent in accordance with section 48-3-601; this finding was not made in the context of a pending adoption proceeding under Chapter 48; and respondent-mother does not challenge the trial court's finding on the consent basis. Further, this finding is not binding in any future action for Marcus' adoption and the trial court properly addressed the other statutory factors. Accordingly, I would conclude the trial court did not abuse its discretion.

## IV. Conclusion

Based on the foregoing, I therefore respectfully dissent from the majority's decision reversing and remanding the trial court's orders. Because respondent-mother cannot show extraordinary circumstances in her writ, and prejudice on the merits if the writ were to issue, I would deny respondent-mother's petition for writ of certiorari and affirm the trial court's 27 December 2024 order. I would also affirm the order of the trial court on respondent-mother's third issue relating to consent for adoption.