IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-812

Filed 1 April 2026

Guilford County, Nos. 24JT001500-400, 24JT001503-400, 24JT001504-400, 24JT001506-400, 24JT001507-400

IN THE MATTER OF:

A.T.T., A.T.W., A.T.T, A.T.W., A.T.T.

Appeal by Respondent-Mother from order entered 27 April 2025 by Judge Charlene Y. Armstrong in Guilford County District Court. Heard in the Court of Appeals 10 March 2026.

> *Mercedes O. Chut for Petitioner-Appellee Guilford County Department of Health and Human Services.*
>
> *Young Moore and Henderson P.A., by Reed J. Hollander and Ashwat C. Giri, for Appellee Guardian ad Litem.*
>
> *Anné C. Wright for Respondent-Appellant Mother.*

COLLINS, Judge.

Respondent-Mother appeals from the trial court's order terminating her parental rights on the grounds of neglect, abandonment, dependency, and willful failure to make reasonable progress in correcting the conditions which led to the juveniles' removal. Mother argues that certain findings of fact are unsupported by the evidence. We affirm.

## I. Background

Mother is the biological mother of Amelia (born in 2017), Axel (born in 2019),

Austin (born in 2021), Alex (born in 2022), and Adrian (born in 2023).[1]  Mother was also the biological mother of Allen, Alex's identical twin, who died on 25 December 2022 at the approximate age of seven months from being "intentionally starved" to death.  On 25 December 2022, the Guilford County Department of Health and Human Services ("DSS") received a report that Mother had called 911 ("EMS") and reported that Allen was not breathing; Mother told EMS that she had put Allen to bed around 5:00 p.m. and found him not breathing around 7:00 p.m.  After arriving at the home and assessing Allen, EMS could not detect Allen's pulse and unsuccessfully tried to revive him with CPR and epinephrine; EMS pronounced Allen dead at 8:00 p.m. and listed cardiac arrest as his preliminary cause of death.  EMS also performed blood work, noting that his blood sugar level was only sixty-two, and EMS described Allen as very small for his age and so emaciated that he was "skin and bones."

Detectives with the Greensboro Police Department arrived at the home the same night and found the home to be "filthy"; they discovered feces smeared on the stairs and the floor littered with dirty diapers and bottles of spoiled milk.  The only food found in the home was dry cereal for the older children and "two small cans" of formula for the twins, Alex and Allen.  They found no clothes for the twins. Detectives noted that Allen's body was so emaciated that the joints in his body looked enlarged and his eyes were sunken into his eye sockets.  They reported that Alex looked as

---

[1] We use pseudonyms to protect the identities of the minor children.

emaciated as his dead twin, Allen.

A DSS social worker arrived at the home on 25 December 2022 and spoke with Mother. Mother admitted that she had not taken the twins to the doctor since their birth and admitted that the older children had not been to the doctor since the family moved to North Carolina in early July 2022. Mother admitted that the twins needed medical care but blamed her sister for failing to meet their medical needs. The social worker determined that the home was too unsanitary for the children, noting that the home was filled with dirty diapers, feces coated the stairway and banister, and the twins' bassinets were full of trash. There were only two small beds for the three older children to share, both beds were dirty, and one lacked bed linens.

Upon Allen's death, the social worker asked Mother to take all of her remaining children to the hospital for immediate assessment and offered transportation; Mother declined and said that she was "tired and wanted to go to sleep for the night." The social worker tried to get Mother to agree to let the children stay with a temporary caregiver, and Mother named her sister as an option. However, Mother's sister had arrived on the scene, reprimanded Mother for cooperating with DSS, and said that "babies just die all the time" when discussing Allen's death. Because of Mother's sister's behavior and "interference with [DSS]," they excluded her as an appropriate caregiver for the children. Mother then named her mother as an option, but she lived out of state and said she would "try[] to work out a way to come to North Carolina . . . in the next few days to help with the children." DSS ruled her out as an appropriate

caregiver for the children. The social worker then told Mother that DSS would be obtaining nonsecure custody of the children; Mother and her sister placed the children in the car and rapidly drove away without securing the children with seatbelts or in car seats. They drove to Mother's sister's home to shower and then drove the children to the hospital. At the hospital, Alex was admitted for malnutrition; his weight was in the ".01 percentile" for babies his age, and he was "emaciated."

A medical examiner performed an autopsy on Allen's corpse on 26 December 2022. She found that Allen had weighed 4.4 pounds at his birth and weighed only 7.07 pounds at his death; he had no food in his stomach or intestines and "had hardly any fat or adipose tissue underlying his skin." He was dehydrated and his kidneys were not functioning normally. The medical examiner concluded that Allen died from malnutrition and dehydration, and she classified his death as a homicide because nothing explained Allen's malnourishment other than him "not being provided proper nutrition by his caregiver." That same day, DSS filed juvenile petitions alleging the children to be neglected and dependent, and the trial court entered a nonsecure custody order for each child.

On 28 December 2022, Mother was arrested and charged with two counts of felony child abuse for Allen and Alex, and one count of first degree murder arising from Allen's death by starvation. From the time the children entered DSS's custody through July 2023, DSS researched the benefits that Mother was receiving and the

resources available to her, and it attempted to work with Mother to determine appropriate caregivers for the children. DSS determined that Mother had been receiving $1,311 per month in Food and Nutrition benefits since 2 December 2022, which allowed only for the purchase of food, including infant formula. She also received $349 of "Work First" benefits, which allowed for cash purchases and withdrawals. DSS printed out transaction logs of Mother's purchases, which showed many cash withdrawals and food purchases at grocery stores throughout the month of December 2022. DSS also determined that Mother had been referred to the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC") after the twins' birth, which would have provided a nutritionist to monitor the weight and nutrition of Allen and Alex and dietary care for the other children; Mother did not sign up for WIC.

In July 2023, Mother gave birth to another child; DSS determined that Mother was unable to care for the child because she was incarcerated and awaiting trial, and DSS eventually took nonsecure custody of the child and filed a petition alleging that the child was neglected and dependent. DSS attempted to locate the children's putative father and ran DNA tests on the man who Mother identified as all of the children's father; DSS determined that there was "zero chance" that the man had fathered any of the children. DSS also determined that none of the children share

the same father, and Mother refused to discuss other possible fathers.[2]

The trial court held an adjudicatory hearing on the juvenile petitions. By order entered 27 September 2023, the trial court adjudicated the children neglected and dependent, and it determined that it was in the children's best interests to remain in DSS custody and for DSS to make reasonable efforts towards reunification for the children. The trial court set a permanency planning hearing for the next month. Mother did not appeal the September 2023 adjudication order. After conducting a permanency planning hearing on 27 October 2023, the trial court relieved DSS of the obligation to make reasonable efforts towards reunification after concluding that aggravating circumstances existed to warrant ceasing those efforts.

Despite ceasing reunification efforts with Mother, DSS entered into a jail case plan with Mother, which required her to (1) not incur any disciplinary infractions while incarcerated, (2) participate in "any and all" available parenting, mental health, and substance abuse programs and classes offered at the facility, and (3) correspond with DSS on a monthly basis. Mother did not complete any component of her case plan, received four infractions while incarcerated, and failed to communicate with DSS. Mother further did not communicate with the children through DSS, did not send letters, money, or gifts, and only sent one picture to each child through DSS.

---

[2] At the time of the hearing to terminate Mother's parental rights, the identities of the children's father(s) were unknown, and the trial court terminated the rights of the children's "Unknown Father(s)."

On 3 July 2024, DSS filed a petition to terminate Mother's parental rights to all the children. On 4 March 2025, the matter came on for hearing, and Mother's rights were terminated on four grounds: neglect, abandonment, dependency, and willful failure to make reasonable progress in correcting the conditions which led to the juveniles' removal. The trial court admitted the September 2023 adjudication order into evidence and found in relevant part, as to the ground of neglect, that:

> The parents' past neglect of the juveniles was proven by clear, cogent, and convincing evidence at the adjudication hearing in the underlying case when the juveniles were adjudicated to be neglected and dependent . . . . [DSS] relies upon the adjudicatory findings of fact contained in the Orders from those adjudication hearings as evidence establishing neglect of the juveniles . . . . Collateral estoppel prevents the parents from being able to re-litigate those facts and issues.

On 12 June 2025, Mother filed timely notice of appeal from the trial court's order terminating her parental rights.

## II. Discussion

Mother argues that the trial court erred in terminating her parental rights on the grounds of neglect, abandonment, dependency, and willful failure to make reasonable progress in correcting the conditions which led to the juveniles' removal. As to the ground of neglect, Mother argues that the trial court erred in terminating her parental rights because there was a lack of evidence as to the conditions between the time of the juveniles' removal and the termination hearing, and because DSS failed to meet its burden of proof.

"Termination of parental rights involves a two-stage process." *In re L.H.*, 210 N.C. App. 355, 362 (2011) (citation omitted). "At the adjudicatory stage, the petitioner bears the burden of proving by clear, cogent, and convincing evidence the existence of one or more grounds for termination under" N.C. Gen. Stat. § 7B-1111(a). *In re D.C.*, 378 N.C. 556, 559 (2021) (quotation marks and citation omitted). "[A]n adjudication of any single ground in [N.C. Gen. Stat.] § 7B-1111(a) is sufficient to support a termination of parental rights." *In re E.H.P.*, 372 N.C. 388, 395 (2019) (citations omitted). "If the petitioner meets its evidentiary burden with respect to a statutory ground and the trial court concludes that the parent's rights may be terminated, then the matter proceeds to the disposition phase, at which the trial court determines whether termination is in the best interests of the child." *In re H.N.D.*, 265 N.C. App. 10, 13 (2019) (citation omitted). At the dispositional stage, if the trial court determines that it is in the child's best interest, the trial court may, in its discretion, terminate the parent's rights. *In re Howell*, 161 N.C. App. 650, 656 (2003).

In reviewing a trial court's adjudication of grounds for termination, this Court must "determine whether the findings are supported by clear, cogent and convincing evidence and [whether] the findings support the conclusions of law" that one or more grounds for termination exist. *In re E.H.P.*, 372 N.C. at 392 (quotation marks and citations omitted). "If clear, cogent, and convincing evidence supports a trial court's findings which support its determination as to the existence of a particular ground for termination of a respondent's parental rights, the resulting adjudication of the

ground for termination will be affirmed." *In re J.R.F.*, 380 N.C. 43, 47 (2022) (citation omitted). This Court reviews "only those findings necessary to support the trial court's determination that grounds existed to terminate" a parent's rights, and the unchallenged findings are "deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407 (2019) (citations omitted). The trial court's conclusions of law are reviewed de novo. *In re C.B.C.*, 373 N.C. 16, 19 (2019).

Pursuant to N.C. Gen. Stat. § 7B-1111(a)(1), the trial court may terminate a parent's parental rights upon finding that "[t]he parent has . . . neglected the juvenile[,]" as defined in N.C. Gen. Stat. § 7B-101. N.C. Gen. Stat. § 7B-1111(a)(1) (2025). In relevant part, a neglected juvenile is defined as one whose parent "[d]oes not provide proper care, supervision, or discipline[,]" "[h]as not provided or arranged for the provision of necessary medical or remedial care[,]" or "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." *Id.* § 7B-101(15)(a), (c), (e) (2025). Furthermore, "[i]n determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect by an adult who regularly lives in the home." *Id.* § 7B-101(15) (2025).

Such "neglect must exist at the time of the termination hearing." *In re B.S.O.*, 234 N.C. App. 706, 714 (2014) (cleaned up). "[I]f the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re V.S.*, 380 N.C. 819, 822 (2022)

(quotation marks and citation omitted). This Court has expressly stated that "[a] parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." *In re C.M.P.*, 254 N.C. App. 647, 655 (2017) (citation omitted).

A parent's incarceration does not preclude a finding of the ground of neglect. *Whittington v. Hendren*, 156 N.C. App. 364, 376 (2003). Our Courts have made "quite clear . . . that incarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision." *In re A.G.D.*, 374 N.C. 317, 320 (2020) (cleaned up). "Although a parent's options for showing affection while incarcerated are greatly limited, a parent will not be excused from showing interest in the child's welfare by whatever means available." *Id.* Thus, while our Courts "recognize the limitations for showing love, affection, and parental concern" that incarcerated parents experience, they are still required "to do what they can to exhibit the required level of concern for their children." *Id.* (citation omitted).

Here, the children had been adjudicated neglected in September 2023. The trial court made the following relevant findings of fact at the adjudication stage of the termination hearing as to the conditions between the time of the children's removal and the termination hearing:

> 16. The conditions that led to the juveniles coming into custody include but are not limited to Improper care; Improper medical/remedial care; Injurious environment; It was reported that around 7:00pm on December 25, 202[2], 5-month-old [Allen] was found unresponsive and had low blood sugar. Life-saving measures were used but they were unsuccessful. [Allen's] twin [Alex] appeared at the hospital

and presented as fragile and malnourished. It was reported that [Mother] stated that she fed the babies but then advised that her sister had taken the formula out of the home. [Mother] refused to take the other children to the hospital for follow-up medical care. [Mother's] sister . . . encouraged [Mother] not to cooperate with [DSS] and advised that the mother will take the children to the hospital after she gets some rest. [Mother] then proceeded to drive off with the children improperly secured in the vehicle. There were also concerns about the condition of the home as it was not clean and there was very little food in the home and feces were smeared on the wall. On July 8, 2023, a report was made stating that [Mother] gave birth to [Adrian] on July 7, 2023. [Mother] is currently incarcerated at the Guilford County Detention Center in Greensboro for two counts of Felony Child Abuse - Any Serious Physical Injury and First-Degree Murder in connection with [Allen's] death on December 25, 2022, [Mother] had an open Foster Care case with Guilford County due to the petition filed on December 26, 2022, for the surviving children. Paternity was not established as of the filing of the petition and there were no other viable childcare arrangements.

. . . .

19. [Mother] has not entered into a full service agreement with [DSS] at this time. [Mother] is currently incarcerated in the Guilford County Detention Center on two counts of felony intentional child abuse inflicting serious bodily injury and felony first degree murder on a $250,000.00 bond. Subsequently, reunification efforts were ceased with [Mother] on October 27, 2023, at the Dispositional Hearing due to the egregious circumstances that brought the juveniles into custody. Although [DSS] was relieved of reunification efforts, [DSS] allowed [Mother] to verbally enter a case plan on November 22, 20[2]4. The case plan was reviewed on November 30, 2024. The mother was not present. The Guilford County Detention Center stated that [Mother] was not able to get on the CFT call due to only federal inmates being able to have meetings via phone. [Mother's] case plan consisted of the following

components:

a. [Mother] will not incur any infractions while incarcerated: She has incurred four (4) infractions since becoming incarcerated.

b. [Mother] agrees to participate in all available programs or classes while she is incarcerated to include substance abuse classes, NA/AA meetings, and parenting classes. [Mother] has failed to provide [DSS] with evidence of any classes she has taken or certificate of completion. [Mother] has failed at attempts to show [DSS] efforts of reunification with the juveniles. She has failed to provide [DSS] with any certificates of service, or any evidence of classes taken during her incarceration.

c. [Mother] agrees to correspond with [DSS] monthly and provide information on classes and programs that she attended. Prior to the filing of this proceeding, [Mother] had the ability to send letters, cards, or tokens of acknowledgment to the juveniles. After the Petition was filed, [Mother] has only drawn one picture for each of the juveniles and has taken no additional steps to communicate with the juveniles or [DSS] in any manner.

d. [Mother] agrees to notify [DSS] within seventy-two (72) hours of her release from jail. [Mother] remains incarcerated at this time.

Contrary to [Mother's] statements desiring to enter into and work a case plan, she failed to complete any component of the jail case plan.

. . . .

29. Since the juveniles have been placed in the custody of [DSS], [Mother] . . . ha[s] not visited the juveniles, or provided any cards, letters or tokens of affection.

. . . .

31. Grounds exist to terminate the parental rights of [Mother] . . . pursuant to N.C. Gen. Stat. § 7B-1111(a)(1), as they relate to the juveniles, given that the parents neglected the juveniles, the neglect continues to date, and there is likelihood of the repetition of neglect if the

juveniles were returned to any parent, as follows:

a. The parents' past neglect of the juveniles was proven by clear, cogent, and convincing evidence at the adjudication hearing in the underlying case when the juveniles were adjudicated to be neglected and dependent . . . . [DSS] relies upon the adjudicatory findings of fact contained in the Orders from those adjudication hearings as evidence establishing neglect of the juveniles by each of those parents. Collateral estoppel prevents the parents from being able to re-litigate those facts and issues.

b. [Mother's] neglect of the juvenile[s] has been ongoing since removal and has continued through the present date, including but not limited to her failure to adequately address the issues which led to the removal of the juveniles by entering into and complying with her service agreement consistently and adequately in order to correct and improve the circumstances existing at the time of removal to the ends that she could provide a safe and stable home with appropriate parenting for her child, and her failure to perform the natural and legal parental obligations of care and support for the juveniles.

c. [Mother] is currently incarcerated as to criminal charges for the starvation of [one of] her twin boys . . . and almost the same for the surviving twin[.] The Autopsy report indicated that [Allen] had no contents in his stomach at the time of death. Against the advice of [DSS] in the assessment phase of this case, [Mother] allowed her sister to encourage her not to take the juveniles to the hospital immediately to be evaluated. Her family members continue to deny the allegations that [Mother] starved or did not feed her children. Although [Mother] was receiving SNAP (food stamp) services beginning September 20, 2022, in the amount of $1300.00 per month; the juvenile became deceased in December 2022. [Mother], having SNAP services indicated that she has ample resources to obtain food and give the juveniles the proper nourishment to survive; however, she was not undertaking that responsibility.

. . . .

e. The many conditions which led to the removal of the juveniles still exist in addition to the ongoing neglect evidenced by the present behaviors of the mother and unknown father(s); there is a great likelihood of the repetition of neglect of the juveniles by their parents.

Mother challenges Finding 31(b) as unsupported because Mother was incarcerated, which resulted in "her inability to be more involved in parenting the children since their removal." We disagree. The record evidence shows that Mother: failed to complete any component of the jail case plan set up for her by DSS; incurred four infractions while incarcerated after agreeing with DSS not to incur any infractions; failed to send cards, letters, or tokens to DSS to pass on to the children, with the exception of a single drawing that Mother sent to each of the children; sent no monies to DSS to provide support for the children; offered no appropriate alternative childcare arrangements; and took no steps to communicate with the children or DSS "in any manner" while incarcerated. This evidence shows that DSS considered Mother's incarceration when it provided her with a jail case plan and opportunities to communicate with the children through DSS, and that Mother did not complete the plan or avail herself of any opportunities to communicate with her children.

Finding 31(b) is thus supported by clear, cogent, and convincing evidence, and the finding supports that Mother neglected the children during her incarceration, and that there was a likelihood of future neglect. *See In re S.D.*, 374 N.C. 67, 82 (2020) (affirming the termination of father's parental rights where the father sent only one

birthday card to his daughter while incarcerated and concluding that there was a likelihood of future neglect where the father had not made "significant progress" on "any component" of his case plan with DSS).

Mother also challenges Finding 31(e) as unsupported, specifically challenging that the "many conditions which led to the removal of the juveniles still exist in addition to the ongoing neglect evidenced by the present behaviors of the mother." However, the clear, cogent, and convincing evidence shows that Mother refused to acknowledge the conditions which led to Allen's death, Alex's malnourishment, and the filthy and unsafe home in which all of the children lived. Further, the clear, cogent, and convincing evidence shows that Mother failed to complete "any component" of her jail case plan and took "no steps to make any efforts to communicate with the children in any manner." This evidence supports that many of the conditions that led to the removal of the children still existed at the time of the hearing terminating Mother's parental rights, and that there was a likelihood of future neglect.

The remaining unchallenged findings of fact support that Mother neglected the juveniles, and they are binding on appeal. *In re T.N.H.*, 372 N.C. at 407. The unchallenged findings show that: Mother starved Allen to death and nearly starved Alex to death; there was "very little" food in the home where the children lived; Mother did not take her children to medical appointments and delayed seeking medical care for Alex, even after Allen's death and despite Alex's "fragile and

malnourished" state; the remaining children lived in the same home where Allen was starved to death and "observe[d] the events leading to [Allen's] death"; and the children's home was "unsanitary" and "filthy," filled with trash and dirty diapers, and had feces smeared along the walls. These findings support that the children were neglected. *See* N.C. Gen. Stat. § 7B-101(15), (a), (c), (e).

The clear, cogent, and convincing evidence, along with the findings of fact, support that Mother neglected the children in the past, and that there was a likelihood of future neglect by Mother. *See In re M.A.*, 374 N.C. 865, 870 (2020) ("A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect."). As only "one ground is necessary to support a termination of parental rights[,]" this Court need not reach Mother's remaining arguments regarding the other grounds. *In re S.C.L.R.*, 378 N.C. 484, 494 (2021).

### III. Conclusion

For the reasons set forth above, we affirm the trial court's order terminating Mother's parental rights.

AFFIRMED.

Chief Judge DILLON and Judge ZACHARY concur.